Shirley LEA, Romona Pinnix, and Annie Tinnin, Plaintiffs,

v.

CONE MILLS CORPORATION, Defendant.

No. C–176–D–66.

United States District Court
M. D. North Carolina,
Durham Division.

July 29, 1969.

Conrad O. Pearson and W. G. Pearson, Durham, N. C.; Chambers, Stein, Ferguson & Lanning, Charlotte, N. C.; and Jack Greenberg, Leroy D. Clark and Robert Belton, New York City, N. Y., for plaintiffs.

Thornton H. Brooks, of McLendon, Brim, Brooks, Pierce & Daniels, Greensboro, N. C., for defendant.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWIN M. STANLEY, Chief Judge.

The plaintiffs, Shirley Lea, Romona Pinnix, and Annie Tinnin, all Negro females residing in Orange County, North Carolina, seek to restrain the defendant, Cone Mills Corporation, from continuing or maintaining any policy or practice limiting or otherwise interfering with the rights of plaintiffs, and others similarly situated, to enjoy equal employment opportunities without regard to race or color, as secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

The case was tried by the Court without a jury. Following the trial, counsel for the parties filed proposed findings of fact and conclusions of law, and briefs, and later appeared before the Court and orally argued their respective contentions.

After considering the entire record, including arguments of counsel, the Court now makes and files herein its Findings of Fact and Conclusions of Law, as follows:

FINDINGS OF FACT

1. Plaintiffs, Shirley Lea, Romona Pinnix and Annie Tinnin, are Negro citizens of the United States and the State of North Carolina, residing in Orange County, North Carolina.

2. The defendant, Cone Mills Corporation (hereinafter referred to as "Cone Mills"), is a corporation incorporated and doing business pursuant to the laws of the State of North Carolina.

3. The defendant maintains its principal corporate office and place of business in Greensboro, North Carolina, and also maintains and operates mills, facilities and offices located in various other cities and towns in the State of North Carolina. Among other manufacturing plants, defendant operates a mill known as the Eno Plant, located in Hillsborough, Orange County, North Carolina, for the manufacture of greige (unfinished) goods.

4. As of July 2, 1965, 346 persons were employed in the Eno Plant. Of these, approximately 310 were white employees and 36 were Negro male employees. No Negro females were employed in any capacity at the Eno Plant.

5. Defendant is an employer within the meaning of § 701(b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

6. The Cone Mills' Personnel Policy Manual, applicable to all Cone Mills facilities, including the Eno Plant, which has been in effect since April 1, 1963, establishes company policy for the recruitment and selection of applicants for employment. The primary standard applied is the applicant's ability to perform any job currently vacant, and the manual directs that this standard be applied without regard to race, creed, color, or national origin. When two or more applicants each meet the ability criteria for a particular vacancy, the manual establishes the following priorities for selection among the applicants:

(a) Laid-off employees

(b) Former employees

(c) Persons residing in or near the communities in which Cone Mills plants are located

7. The written hiring procedures of Cone Mills, also applicable to the Eno Plant, are as follows:

(a) The applicant fills out an application form, is interviewed by the personnel manager, and given aptitude and visual tests.

(b) The applicant's work history is investigated, and if found satisfactory, the applicant is further interviewed.

(c) Applicants found satisfactory are then given a physical examination.

(d) Applicants satisfying all such requirements, including the physical examination, are offered employment.

8. When the portion of the Personnel Policy Manual covered by Finding 7 was issued, the testing of applicants referred to in sub-paragraph (a) was optional with various plant managers. All other provisions were mandatory. Testings began at the Eno Plant in November or December of 1965.

9. Prior to July 2, 1965, males, Negro and white, and white females were employed in various job classifications at the Eno Plant. No Negro females had ever been employed in any capacity at the plant as of that date. However, prior to the spring of 1965, no Negro females had ever applied for employment at the plant. While unable to recall specific names, dates or circumstances, the personnel manager and receptionist at the Eno Plant stated that some Negro females did apply for jobs between January 1, 1965, and July 2, 1965.

10. In 1960 or 1961, John Bagwill, the then Vice President for Industrial Relations of Cone Mills, requested and received a review of Cone's hiring policies and procedures with regard to the number of Negroes employed. In 1963, more than one year before the enactment of the Civil Rights Act of 1964, the previously referred to directive to plant managers was placed in the Personnel Policy Manual. This directive made it mandatory that there be no discrimination on the basis of race in the hiring or promotion of Cone Mills employees. In the summer of 1965, shortly before the effective date of the Civil Rights Act of 1964, Cone Mills officials met with all plant managers and reviewed the provisions of the Act and the established company policy. No specific recommendation was made, however, concerning the hiring of Negro females at the Eno Plant.

11. Prior to July 9, 1965, Cone Mills performed some work at some of its plants and mills pursuant to contracts with the United States under Executive Order No. 10925, and therefore was under an obligation to institute an affirmative action program to insure that its hiring and promotional practices were carried out without regard to race, creed, color or national origin of the applicants and employees. There is no evidence, however, that Cone Mills has ever been found in violation of its affirmative obligation to insure non-discrimination.

12. Both before and after July 2, 1965, the practice at the Eno Plant was to accept applications from all applicants, even though no vacancy existed at the time the application was made. The only times no applications were taken

were the last week of July of each year when the plant was closed for vacations, and the single period of about one week in June of 1965 when a sign was posted on the door that no applications would be received.

13. No basic changes occurred in the written hiring policies of Cone Mills subsequent to July 2, 1965, except to provide that, in addition to "race, creed, color or national origin," "sex" would not be a consideration in the hiring and promotion of applicants and employees.

14. Because of the requirements of physical strength, certain jobs at the Eno plant are considered "male" jobs, and other jobs, not so physically demanding, are considered "female" jobs. For example, all jobs in the carding department, with the exception of the part-time job of lab technician, are considered male jobs. The classifications of spinner, spool tender, quiller operator, and battery filler, are considered female jobs. Jobs in the cloth room are considered male jobs.

15. This action was instituted on September 15, 1966, and by November 1, 1966, there were five Negro females employed at the Eno Plant.

16. The present personnel manager at the Eno Plant had served in that capacity for at least ten years prior to the filing of the complaint in this action. The personnel manager is also the office manager.

17. With regard to the hiring procedures at the Eno Plant, an applicant for employment is given an application form by the receptionist. When the form has been completed, the applicant is interviewed by the personnel manager to determine the applicant's work history. The interview also covers the determination of facts concerning the priorities enumerated in Finding 6, such as whether the applicant is a former Cone Mills employee, whether he resides in a community near a Cone Mills facility, and whether he has friends or relatives working at the plant in question. This interview is conducted without regard to the existence of a vacancy. When there is a vacancy, an interview, under certain circumstances, is scheduled between the applicant and the supervisor in whose department the vacancy exists. If the applicant is satisfactory and a vacancy exists, the applicant is given a physical examination. If the application passes the physical examination, he is given the job.

18. If the applicant is not offered a job at the time the application is made, the application is placed on the top of a stack of previously filed applications on the desk of the personnel manager. It is expected that applications will be renewed approximately every two weeks to assure the personnel manager that the applicant is still interested in a job. As applications are renewed, they are placed on top of the stack and the renewal date recorded. If an applicant does not renew his application within approximately two weeks, his application stays on the bottom of the stack. At some point between two weeks and a month, applications which have not been renewed are filed in an alphabetical file. If a renewal is subsequently made, the application is removed from the alphabetical file, the renewal date is noted thereon, and the application is again placed on top of the stack.

19. When a vacancy exists and no prospect fitting the qualifications happens to apply personally, the personnel manager examines the files of current applications for a suitable prospect. If there is such an application on file, the applicant is contacted by telephone, postcard or through the references he has given on the application. After a satisfactory physical examination, he is offered the job. If no applicant with experience is available, the personnel manager will consider employing an inexperienced person.

20. Generally, a vacancy in the Eno Plant can be filled within one or two days.

21. In filling vacancies, the Eno Plant Manager accords first priority to those applicants with experience, either

in the particular job to be filled or in a related industry. Second priority is accorded to an applicant who has a relative then working at the Eno Plant. Next in order of priority is an applicant who has a close friend working at the plant. Residence of the applicant is the last in the order of priority. None of the plaintiffs have relatives or close friends employed at the Eno Plant, and none were experienced in any type of manufacturing work.

22. No applicant is required to disclose his race on the application form. He is required, however, to list the schools which he attended, and prior to 1965, the race of the applicant could generally be determined by the schools the applicant had attended because the schools in Orange County were at that time predominantly Negro or predominantly white.

23. On one or more occasions prior to September 2, 1965, some of the plaintiffs had applied for employment at the Eno Plant, and had gained the impression that the Eno Plant, as a matter of company policy, did not employ Negro females.

24. On the morning of September 2, 1965, pursuant to a previous agreement, the plaintiffs and several other Negro females met at a church and received instructions with respect to plants they were to visit and make applications for employment. It was part of the plan for the individuals to return to the church following the filing of the applications in order to sign complaints against companies which did not offer them employment.

25. On September 2, 1965, each of the plaintiffs, in addition to several other Negro females, applied for employment at the Eno Plant. Plaintiffs and the other Negro females were allowed to file applications. After completing the applications, the personnel manager interviewed the plaintiffs and the other applicants two or more at a time.

26. When the plaintiffs applied for employment at the Eno Plant on Sep-tember 2, 1965, one of them, Mrs. Tinnin, was already employed, one had never worked before, and none had had experience working in a textile plant.

27. Plaintiffs Lea and Pinnix were interviewed by the personnel manager at the same time. Both testified that the personnel manager told them that the Eno Plant did not employ Negro females. The personnel manager did not remember the question being asked, but testified that it was a fact that no Negro females had ever been employed at the plant. From the conflicting evidence, it is found that, for all practical purposes, Negro females were not considered for employment at the Eno Plant, at least prior to July 2, 1965.

28. Plaintiffs Pinnix and Tinnin listed telephone numbers on their application forms. As of the date of the trial neither of them had been contacted by telephone or otherwise concerning the possibility of employment. However, one of the Negro females who applied for employment along with the plaintiffs renewed her application subsequent to September 2, 1965, and was employed in August of 1966, when a vacancy occurred and no experienced person could be found to fill the position.

29. The history of employment at the Eno Plant shows that the company relies heavily on the employment of relatives and friends of the family as a prime source of filling vacancies. A number of members of the same family are employed at the Eno Plant at the same time. The Eno Plant is practically the only manufacturing plant in the Hillsborough area which offers industrial employment, and is the only textile mill in the area operated to any extent.

30. The Personnel Policy Manual does not require the renewal of applications every two weeks, and the plaintiffs were not advised that in order for their applications to remain active it would be necessary for them to renew their applications approximately every two weeks.

31. On or about November 5, 1965, approximately two months after plain-

tiffs applied for employment, a vacancy occurred for which at least one of the plaintiffs could have been employed. An inexperienced white female was employed to fill the vacancy, and no effort was made to contact any of the plaintiffs. The first Negro female employed at the Eno Plant was employed on March 17, 1966.

32. Between July 2, 1965, and November 1, 1966, approximately 167 persons were employed at the Eno Plant. Of these, 85 were white males, 53 were Negro males, 22 were white females, and 7 were Negro females.

33. On or about October 26, 1965, the Equal Employment Opportunity Commission accepted charges as properly filed made by each of the named plaintiffs, as well as charges made by Lizzie M. Bradshaw, Magdalene Bradshaw, Ida Fuller, Inez Corbett, Laura Jean Battle, Caroline Corbett, and Annie Torraine, all Negro females residing in Orange County, North Carolina, alleging that they had been denied employment by Cone Mills at its Eno Plant on September 2, 1965, because of their race.

34. On June 24, 1966, the Equal Employment Opportunity Commission found reasonable cause to believe that the named plaintiffs, and Lizzie Bradshaw, Magdalene Bradshaw, and Ida Fuller, had been denied consideration for employment on September 2, 1965, because of their race.

35. By letter dated August 19, 1966, Kenneth F. Holbert, Acting Director of Compliance for the Commission, sent letters to each of the named plaintiffs advising that "due to the heavy workload of the Commission, it has been impossible to undertake or to conclude conciliation efforts," and that a civil action could be filed in the appropriate Federal District Court.

36. The complaint in this action was filed on September 19, 1966, within 30 days after notification from the Commission.

## DISCUSSION

Section 703(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) provides:

"(a) It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

Section 706(g) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(g) provides:

"(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice). Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admis-

sion, suspended, or expelled or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex or national origin or in violation of section 2000e–3(a) of this title."

While the defendant's Personnel Policy Manual, effective since April 1, 1963, directs the selection of applicants for employment without regard to race, statistics, which often tell more than words, effectively refute the claim that the policy was practiced with respect to Negro females. State of Alabama v. United States, 5 Cir., 304 F.2d 583 (1962). The fact that no Negro females had applied for employment before the spring of 1965 does not, contrary to the argument of defendant, show either lack of interest or disprove discrimination. The more plausible explanation of this inaction is that, because of defendant's hiring practices over a long period of years, Negro females felt their efforts to obtain employment would be futile. Cypress v. Newport News General & Nonsectarian Hosp. Ass'n, 4 Cir., 375 F.2d 648 (1967). Moreover, defendant's hiring procedures of granting initial hiring preference to former employees and close friends and relatives of its existing work force is inherently discriminatory against Negro females. Dobbins v. Local 212, International Bro. of Elec. Wkrs., 292 F.Supp. 413 (S.D.Ohio, 1968). Even though seven Negro females have been employed, the hiring preferences of defendant will continue to place Negro female applicants at a competitive disadvantage when seeking employment, thus constituting a prima facie inference of discrimination.

Another practice inherently discriminatory, particularly when tested by its operation and effect, was the failure of the defendant to notify the plaintiffs that they were required to renew their applications about every two weeks in order for them to be considered for employment in the event a vacancy arose. This renewal policy was not included in any written manual or other hiring policy to which the plaintiffs would have had access. Since plaintiffs had no employed relatives or friends whereby they could learn of the policy, they were effectively denied the right to even be considered for employment after about two weeks from the time their applications were filed.

The Court is authorized by 42 U.S.C. § 2000e–5(g) to enjoin the discriminatory employment practices engaged in by defendant with respect to Negro female employees at its Eno Plant, and the plaintiffs, and the class they represent, are entitled to an order which will effectively eliminate such discriminatory practices. Since it is clearly apparent that when plaintiffs applied for employment at defendant's Eno Plant on September 2, 1965, their primary motive was to test defendant's employment practices rather than to seek actual employment, and since there has been no showing whatever that defendant has since employed any females, either Negro or white, possessing plaintiffs' education, background, skill and work experience, and since no vacancy of any type existed on September 2, 1965, plaintiffs are not entitled to recover back pay from September 2, 1965, or counsel fees. The fact that no vacancy existed on September 2, 1965, does not, however, preclude plaintiffs from maintaining this action, since Negro females were not considered for employment at that time. The order will apply prospectively only, but will be sufficient to effectively eliminate all discriminatory practices with respect to future female applicants for employment.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and of the subject matter of this action.

2. This action is properly maintained as a class action under Rule 23(a) and (b) (2) of the Federal Rules of Civil Procedure. The class includes all Negro females who are, or who might be, affected by any racially discriminatory policies or practices of the defendant.

3. The policies and practices of the defendant at its Eno Plant, and its conduct pursuant thereto, with reference to employment of Negro females, constitute a pattern and practice of discrimination within the meaning of Title VII of the Civil Rights Act of 1964.

4. The defendant has intentionally engaged in, and continues to intentionally engage in, unlawful employment practices at its Eno Plant with respect to the employment of Negro females.

5. The plaintiffs are entitled to enjoin the discriminatory employment practices herein described.

Counsel for the plaintiffs will prepare and present to the Court an appropriate order after same has been approved by counsel for the defendant as to form. Failing to agree on the form of the order, counsel for the parties will express themselves with reference thereto not later than August 20, 1969.