**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Petitioner,**

v.

**UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, LOCAL UNION NO. 189; and Mechanical Contractors Association of Central Ohio, Inc., Respondents.**

Civ. A. 69–160.

United States District Court,
S. D. Ohio, E. D.

April 14, 1970.

See also D.C., 311 F.Supp. 464.

Russell Spector and Marian Halley, E.E.O.C., Washington, D. C., for petitioner.

R. Brooke Alloway and N. Victor Goodman, of Topper & Alloway, Columbus, Ohio, for the Union.

Joseph Millious, Columbus, Ohio, for the Association.

John W. Palmer, Columbus, Ohio, amicus curiae.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court on the motion of the petitioner, the Equal Employment Opportunity Commission (hereinafter "Commission"), for a summary judgment under the provisions of Rule 56 of the Federal Rules of Civil Procedure. This motion is sought against the respondent, the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, Local Union No. 189 (hereinafter "Union"), on the issue of whether the Union has violated the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2 (hereinafter Title VII) with respect to the hiring hall and referral provisions of their collective bargaining agreement with the other named defendant, the Mechanical Contractors Association of Central Ohio, Inc. (hereinafter "Association").

Rule 56(a) of the Federal Rules of Civil Procedure states that:

A party seeking to recover upon a claim * * * may * * * move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof.

And where the pleadings, affidavits and exhibits on file show that there is no genuine issue as to any material fact related to the issue presented by the motion, a summary judgment on that motion, if appropriate, may be rendered forthwith.

The jurisdiction of this Court is invoked pursuant to the provisions of Section 706(i) of Title VII of the Civil Rights Act of 1964. This statute provides:

In any case in which an employer, employment agency, or labor organization fails to comply with an order of a court issued in a civil action brought under subsection (e) of this section, the Commission may commence proceedings to compel compliance with such order. 42 U.S.C.A. § 2000e-5(i).

The order which the Commission claims has been violated was issued by this Court on May 29, 1968 in the case of Locke v. Local Union No. 189, et al, Civil No. 68–148 (S.D.E.D.Ohio, 1968). The *Locke* case was a private action under Title VII (42 U.S.C.A. § 2000e et seq.) to redress and enjoin unlawful employment practices, specifically discrimination on the basis of race, on the part of the named defendants.

On May 29, 1968, on the basis of the Settlement Agreement entered into among the parties, the Court ordered in part that:

3. Articles XV and XVI of the [Collective Bargaining] Agreement [relating to hiring hall and referral procedures and seniority and lay-off

provisions] between Local Union No. 189 and the Mechanical Contractors Association of Central Ohio, Inc., effective June 1, 1967, shall be renegotiated between the parties to the Collective Bargaining Agreement for the sole purpose of assuring compliance with Title VII of the Civil Rights Act of 1964, and submitted to the Court for approval.

Subsequently, on September 30, 1968, a Memorandum of Approval was submitted to the Court, and then signed by this district judge, which stated in part:

Upon consideration thereof, the Court approves such renegotiated Articles XV and XVI, a copy of which is attached to this Memorandum and made a part hereof, as *appearing* to be in compliance with Title VII of the Civil Rights Act of 1964. [Emphasis added.]

The renegotiated Articles XV and XVI are attached to this Opinion and Order as Appendix A.

The Commission contends in the present proceeding that these renegotiated provisions of the Collective Bargaining Agreement are not, in fact, in compliance with Title VII and that the Union should be required to alter certain provisions of these articles to comply fully with the May 29, 1968 Order in the *Locke* case.

 The respondent correctly points out that the remedy of summary judgment is only appropriate when there is no dispute as to material facts related to the issue presented by the motion. It is also true that when there are inferences sought to be drawn from undisputed facts, they are to be viewed in a light most favorable to the party against whom the summary judgment is sought. Williamson v. Wilbur-Rogers, Inc., 381 F.2d 719 (6th Cir. 1967).

The Union has asserted repeatedly that it does dispute some of the facts upon which the Commission must rely in order to set forth a meritorious motion for summary judgment. However, nowhere in the record of this case does it appear that the following facts are genuinely disputed, and the Court finds that they are not, in fact, nor could they reasonably be, disputed.

1. The provisions of the present collective bargaining agreement establish a system of priorities of available work, priority being given to the persons in Group I.[1]

2. The Union's present referral list contains about 1100 names.

3. There are 800 journeymen in Group I, all of whom are white.

4. There is not one Negro journeyman working within the Union's jurisdiction eligible for placement in Group I.

5. There are no Negro journeymen who will become eligible for assignment to Group I in the foreseeable future.

6. There are no Negroes [with the possible exception of Frank Williams] assigned to Group II to which about 300 white journeymen are assigned.

7. Prior to September, 1968, the Union had never referred a Negro.

8. The Union only recently admitted its first Negro apprentices.

9. The Union has never had a Negro member [with the possible exception of Frank Williams].

10. There are at least nine Negroes within the jurisdiction of the Union who possess City of Columbus plumbing licenses.

11. There are presently and there have been Negroes within the Union's jurisdiction who can perform plumber's work.

12. There are presently Negroes in the Union's jurisdiction who are capable of safely and efficiently performing journeyman work, but

1. The relevant provisions of the collective bargaining agreement are contained in Appendix A, attached hereto.

who do not meet the requirements set forth in the collective bargaining agreement for placement in Groups I or II.

13. The 1960 Census of Population of the three counties (Franklin, Delaware and Pickaway) which comprise the metropolitan Columbus, Ohio area showed a total population of 754,885 persons. Of this total, the Census listed 81,917 as being members of the Negro race.

With these facts before the Court as undisputed, the essential question presented for judicial determination at this time is whether or not these facts are sufficient to support a summary judgment in the petitioner's favor. Stated otherwise, do the undisputed facts justify a finding by this Court that the hiring hall and referral provisions of the collective bargaining agreement operate in a discriminatory manner and thus are in violation of Title VII of the Act?

Diligent research by this Court has failed to disclose any precedent on the provisions of Section 706(i) of Title VII, the section which serves as the jurisdictional basis of this lawsuit. However, there are several cases decided under Section 707 of the Act (known as "pattern and practice" suits) which have been initiated by the Attorney General and which provide this Court with precedent on matters involving the interpretation of Title VII.

The Union is adamant in its assertion that it has never engaged in discriminatory practices as they are circumscribed by Title VII and that because this fact is central to the dispute between the parties, summary judgment cannot be granted on the Commission's motion. To this the Court responds that the Union has misinterpreted the thrust of the Commission's motion. The matter of whether or not the hiring hall and referral provisions of the collective bargaining agreement are violative of Title VII is presently a matter for judicial determination. A mere denial of the ultimate fact, namely discriminatory practices, does not automatically preclude the Court from consideration of the merits of the present motion, any more than a denial of negligence in a personal injury suit would bar summary judgment where the undisputed facts proved otherwise. This Court must decide whether, in light of federal statutory law, the precedents of the federal courts interpreting such law, and the undisputed facts established by the Commission, the provisions of the agreement are in violation of Title VII.

It may be true that in some cases statistics do not lie, but the present interest of this Court is directed to whether the statistics tell the whole truth.

In the problem of racial discrimination, statistics often tell much, and Courts listen. State of Alabama v. United States, 304 F.2d 583, 586 (5th Cir. 1962), aff'd 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962).

Even under the relatively recent provisions of Title VII, there have been a number of cases which have considered the role of statistics in relation to claims of racial discrimination.

In Lea v. Cone Mills Corporation, 301 F.Supp. 97 (M.D. N.C. 1969) the Court recited as relevant findings of fact that:

4. As of July 2, 1965, 346 persons were employed in the Eno Plant. Of these, approximately 310 were white employees and 36 were Negro male employees. No Negro females were employed in any capacity at the Eno Plant.

\* \* \* \* \* \*

15. This action was instituted on September 15, 1966, and by November 1, 1966, there were five Negro females employed at the Eno Plant.

\* \* \* \* \* \*

27. Plaintiffs Lea and Pinnix were interviewed by the personnel manager at the same time. Both testified that the personnel manager told them that the Eno Plant did not employ Negro females.

The personnel manager did not remember the question being asked, but testified that it was a fact that no Negro females had ever been employed at the plant. From the conflicting evidence, it is found that, for all practical purposes, Negro females were not considered for employment at the Eno Plant, at least prior to July 2, 1965. *Lea, supra,* 301 F.Supp. at 97–100.

The Court went on to say at page 102 that:

While the defendant's Personnel Policy Manual, effective since April 1, 1963, directs the selection of applicants for employment without regard to race, statistics, which often tell more than words, effectively refute the claim that the policy was practiced with respect to Negro females. State of Alabama v. United States, 5 Cir., 304 F.2d 583 (1962). The fact that no Negro females had applied for employment before the spring of 1965 does not, contrary to the argument of defendant, show either lack of interest or disprove discrimination. The more plausible explanation of this inaction is that, because of defendant's hiring practices over a long period of years, Negro females felt their efforts to obtain employment would be futile. Cypress v. Newport News General & Nonsectarian Hosp. Ass'n., 4 Cir., 375 F.2d 648 (1967). Moreover, defendant's hiring procedures of granting initial hiring preference to former employees and close friends and relatives of its existing work force is inherently discriminatory against Negro females. Dobbins v. Local 212, International Bro. of Elect. Wkrs., 292 F.Supp. 413 (S.D. Ohio, 1968). Even though seven Negro females have been employed, the hiring preferences of defendant will continue to place Negro female applicants at a competitive disadvantage when seeking employment, thus constituting a prima facie inference of discrimination. *Lea, supra,* 301 F. Supp. at 102.

In United States v. Sheet Metal Workers International Association, Local Union No. 36, 280 F.Supp. 719 (E.D. Mo. 1968), a "pattern and practice" suit brought by the Attorney General pursuant to Title VII, 42 U.S.C.A. § 2000e-2(c), the trial court relied heavily on statistics to find the existence of pre-Act racial discrimination. *See, Sheet Metal Workers, supra,* 280 F.Supp. at 721.

The Union asserts that the use of statistical data regarding Negro population in a given area as compared to Negro representation in a defined group, such as a craft union, is inappropriate because, as the court said in Dobbins v. Local 212, International Brotherhood of Electrical Workers, 292 F.Supp. 413 (S. D.Ohio 1968):

In some fields a prima facie case of pattern and practice is made out on a showing that given privileges are exercised only, or for the greater extent, by W's [Whites] and that there is in the area a substantial N [Negro] population and that there have been repeated attempts by N's to exercise such rights. Such is certainly true in the education and voting fields. However, we deal here with a "craft" union.[15]

15. There is no such thing as an "Instant Electrician"—by court decree or otherwise. *Dobbins, supra,* 292 F.Supp. at 445.

It is one thing to presume or assume, prima facie or otherwise, that a significant number of a group have the qualifications for schooling or voting, or jury service. It is another thing to assume, prima facie or otherwise, that because a certain number of people exist, be they W or N, that any significant number of them are lawyers or doctors, or merchants, or chiefs—or to be concrete, are competent plumbers or electricians or carpenters. While the electricians may only date back to Benjamin Franklin, they are part and parcel of building trades and from time immemorial the word "craft" is necessarily entwined with skill. That is true even in the dictionary.

\* \* \* \* \* \*

The assumption that the Court found objectionable in the *Dobbins* case does not have to be made in the instant case. The Union agrees that there are approximately nine (9) Negroes in the City of Columbus who possess city plumbing licenses. The contention has not been made, nor could it reasonably be made, that the obtaining of a city plumbing license does not bear some relationship to the ability of that person to perform the "craft" of plumbing. In fact, the Union seems to *require* that a person obtain one before admission to its membership, presumably because it *does* bear a direct relationship to the individual's qualifications to engage in the occupation of plumbing. In the affidavit of Charles Gronback, a member of the Examining Board of Local 189, it is stated:

> As the facts stated herein show, the written examination [the journeyman examination given by the Board] is designed to and does test only for very minimal and necessary knowledge of legal and practical requirements in the trade. *Any person passing the City of Columbus license examination can pass the journeyman written examination.* [Emphasis added.] Gronback Affidavit, ¶ 9.

It is thus perfectly clear to this Court that the possession of a City of Columbus plumbing license does indeed indicate that the licensee has acquired sufficient skill in the craft of plumbing to qualify as a journeyman even under the Union's standards. This being true, it is an undisputable fact that there are at least nine (9) Negro plumbers in the City of Columbus who possess skills commensurate with white Union journeymen presently in Seniority Groups I and II under the Union's Collective Bargaining Agreement.

In United States v. Sheet Metal Workers International Association, Local Union No. 36, et al, 416 F.2d 123 (8th Cir. 1969) the Court cited with approval the proposition that:

> Obviously, when a large company [labor organization] in an area with a diverse population is found to have no Negro employees [members], even though it hires new men regularly [accepts new men regularly] and has standard job requirements [standard membership requirements], the inference of discrimination is reasonable. *Local Union No. 36, supra,* 416 F.2d at 127 fn. 7 [citing 32 U. of Chi.L. Rev. at 461].

There are other cases which additionally support the use of statistics in finding racial discrimination. See, United States v. Plumbing and Pipefitting Industry, Local 73, 61LC ¶ 9329, p. 6864 (S.D. Ind. 1969) and United States v. Hayes International Corp., 415 F.2d 1038 (5th Cir. 1969).

There are two additional factors worthy of note at this time. First, the Court considers it not a mere coincidence that only after the initiation of the present litigation (including the private action under Title VII, Locke v. Local Union No. 189, et al, Civil No. 68–148 (S.D. E.D. Ohio 1968)) did the Union see fit to place Negroes on the referral list. And, in spite of the fact that Negroes were only placed in the least desirable seniority group, Group III, at least fifteen (15) Negro plumbers were placed on the referral list in the short period between January, 1969 to June, 1969. It seems most fanciful to suggest that suddenly fifteen (15) Negro plumbers, who never before sought or desired to seek placement on the Union's referral list, appeared by chance just subsequent to these Title VII proceedings against the Union. The true fact is that Negro plumbers were always present, but now they thought they had at least a hopeful chance at equal referral rights.

The Union has argued at various times that the proof adduced in prior Title VII cases has been much more probative and convincing than that aserted here, and that this difference in degree is significant enough to require this Court to deny the relief that the Commission seeks. The judicial decisions relied upon by the Union for this proposition are in the main "pattern and practice" suits

brought by the Attorney General. The Commission in the instant case is not burdened with establishing a "pattern and practice" of discrimination, but rather must only show the illegality under Title VII standards of the provisions of the Collective Bargaining Agreement. This burden the Commission has carried.

The Union repeatedly points out that even if there are skilled Negro plumbers within their jurisdiction, there is a singular lack of interest on the part of these Negro plumbers to join the Union. However, such apathy is not surprising when considered in light of the fact that Negroes would at best be placed in Seniority Group II, thus immediately placing at least 800 white journeymen in a more favorable position vis-a-vis the equally skilled Negro and creating a substantial possibility of long periods of unemployment because Group II plumbers would be the first ones laid off. The acceptance of lower paying non-union work on the part of the Negro plumbers is also explainable by the fact that the Negro community knew that the Union was off limits to members of their race. Deposition of Louis Toone at pp. 26–28; Deposition of Robert N. Milnar at pp. 52–54. *See*, Lea v. Cone Mills Corporation, *supra*, 301 F.Supp. at 102; United States v. Sheet Metal Workers International Association, Local Union No. 36, et al, *supra*, 416 F.2d at 132; and United States v. Plumbing and Pipefitting Industry, Local 73, *supra*. The Court determines that the alleged lack of active interest on the part of Negro plumbers in joining the Union, or even in using the Union's hiring hall, is not due to the absence of any skilled Negro plumbers in the area, nor does it tend to show lack of discriminatory practices on the part of the Union. The Union's reputation in the Negro community belies the contention that it had an "open door" policy but that only whites choose to walk through.

▪ The Court determines that the *inescapable* conclusion to be drawn from the undisputed and indisputable facts that appear on this record is that the present seniority and layoff provisions of the Collective Bargaining Agreement (see Appendix A) have the effect of perpetuating past discriminatory practices. This conclusion is reached on the basis of the requirement of Seniority Group I that plumbers must have been employed for at least 1200 hours a year in each of any five consecutive years under a Collective Bargaining Agreement between the parties to this Agreement. Heretofore Negroes have been effectively precluded from any possibility of fulfilling this requirement and thus have been denied equal employment opportunity because of their race.

Further bases for this conclusion are the journeyman examination requirement of Groups I and II which, in light of the requirement for a City of Columbus plumbing license, bears no reasonable relation to the ability of the individual to perform the craft of plumbing and the five years of experience required for Group II placement which, in light of a similar provision for only one year of experience if acquired through the apprentice program can only operate to exclude non-apprentices (heretofore Negroes) from securing referral on an equal basis for equal skill.

Whereupon, the Court determines that the motion of the petitioner for summary judgment is meritorious and therefore it is granted.

### Relief

▪ The nature of the relief to be granted in a case such as presented here is difficult to formulate. As the Fifth Circuit has stated:

In this case we deal with one of the most perplexing issues troubling the courts under Title VII: how to reconcile equal employment opportunity *today* with seniority expectations based on *yesterday's* built-in racial discrimination. May an employer continue to award formerly "white jobs" on the basis of seniority attained in other formerly white jobs, or must the employer consider the employee's experience in formerly "Negro jobs" as an equivalent measure of seniority?

Local 189, United Papermakers and Paperworkers, et al v. United States, 416 F.2d 980, 982–983 (5th Cir. 1969). Translated into the context of the present situation, can the Union in its Collective Bargaining Agreement require as a criterion for inclusion in the top seniority group experience under prior Collective Bargaining Agreements, which experience has been effectively denied the Negroes of this community?

The Commission, in its motion for summary judgment seeks the following remedy:

1. The immediate placement of all Negroes in Group III into Group I.

2. A proper method of communicating the Union's policy of non-discrimination to the Negro community, inviting Negro craftsmen to seek placement on the referral list, and the placement on the list in Group I of all persons who have a year or more experience in the trade.

3. The establishment of a period of two or more years during which Negro craftsmen will be entitled to apply for placement on the referral list.

4. Establish opportunities for granting to Negroes outside the normal age for apprentices, opportunities to learn the trade.

5. Forbid the imposition of a testing requirement as to all persons who have a year of experience.

The range of remedies afforded in other Title VII cases has been wide. See, *Local 189, supra*, 416 F.2d at 985, Quarles v. Philip Morris, Incorporated, 279 F. Supp. 505, 520–521 (E.D. Va. 1968); and Dobbins v. Local 212, International Brotherhood of Electrical Workers, 292 F.Supp. 413, 450–453 (S.D. Ohio, 1968).

With respect to seniority provisions, Title VII of the Civil Rights Act of 1964 states:

(b) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employee to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, * * * provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin * * *. 42 U.S.C.A. § 2000e-2(h).

In *Quarles*, the Court stated:

The court holds a departmental seniority system that has its genesis in racial discrimination is not a *bona fide* seniority system.

Section 703(h) [42 U.S.C.A. § 2000e-2(h)] also contains a proviso that touches upon the issue. It declares that it shall not be an unlawful employment practice for an employer to apply different standards pursuant to a *bona fide* seniority system " * * * provided that such differences are not the result of an intention to discriminate because of race * * *." The differences between the terms and conditions of employment for white (sic) and Negroes about which plaintiffs complain are the result of an intention to discriminate in hiring policies on the basis of race before January 1, 1966. The differences that originated before the act are maintained now. The act does not condone present differences that are the result of intention to discriminate before the effective date of the act, although such a provision could have been included in the act had Congress so intended. The court holds that the present differences in departmental seniority that result from the company's intentional, racially discriminatory hiring policy before January 1, 1966, are not validated by the *proviso* of § 703(h). *Quarles, supra*, 279 F.Supp. at 517–518.

The seniority system in the present case is not *bona fide* because the present structure perpetuates past discriminatory practice.

Therefore, it is ordered, adjudged and decreed as follows:

1. The Union and the Association shall enter into a renegotiated Collective Bargaining Agreement which will provide, inter alia, for:

(a) The elimination of the five year experience requirement now in effect for Seniority Groups I and II.

(b) The elimination of the journeyman's examination as given by the Union as a requisite for Seniority Groups I and II. The possession of a city plumbing license will make a person, otherwise eligible, a member of the highest seniority group.

(c) The elimination of the requirement of Union membership for placement and/or referral in the highest seniority group.

(d) The placement of all Negroes who possess city licenses and who are presently enrolled in any seniority group in the highest seniority group.

(e) One year's experience in the trade and possession of a city plumbing license to make any person eligible for referral on the same basis as any other plumber regardless of Union membership.

(f) An apprenticeship program which will establish opportunities for Negroes, outside the normal age for apprentices, to learn the trade. The provisions of the apprenticeship program shall have no effect on the enrollee's eligibility for inclusion on the referral list.

2. The Union and the Association shall submit such renegotiated agreement to the Court within forty-five (45) days of the date of this Order.

3. This Court shall retain jurisdiction of this action for such further relief or modification of this Order as may be required.

APPENDIX A

ARTICLE XV. REFERRAL AND HIRING HALL PROCEDURE.

In the interest of maintaining an efficient system of production in the industry, providing for an orderly procedure of referral of applicants for employment, preserving the legitimate interests of the employees in their employment status within the area and to insure that there shall be no discrimination in employment because of membership or non-membership in the Union, the parties hereto agree to the following system of referral of applicants for employment;

(1) The Union shall be the sole and exclusive source of referrals of applicants for employment.

(2) The Union shall select and refer applicants for employment without regard to race, creed, color or national origin and without discrimination against such applicants by reason of membership or non-membership in the Union and such selection and referral shall not be affected in any way by rules, regulations, by-laws, constitution provisions or any other policies or requirements. All such selection and referral shall be in accordance with the following procedure:

(3) The Union shall maintain a register of applicants for employment established on the basis of Seniority Groups listed below. Each applicant for employment shall be registered in the highest priority Group for which he qualifies.

SENIORITY GROUP I. All applicants for employment who have five (5) or more years' experience in the plumbing and pipe fitting trade, are residents of the geographical area constituting the normal construction labor market, have passed a journeyman's examination given by a duly constituted local union of the United Association and who have been employed for at least 1200 hours a year in each of any five consecutive years under a Collective Bargaining Agreement between the parties to this

Agreement. Apprentices who have completed their probationary training period in accordance with the rules of the Plumbers and Pipe Fitters Apprenticeship Program, as established by the parties hereto, shall be registered and placed in Seniority Group I.

SENIORITY GROUP II. All applicants for employment who have five (5) or more years' experience in the plumbing and pipe fitting trade and who have passed a journeyman's examination given by a duly constituted local union of the United Association.

SENIORITY GROUP III. All applicants for employment who have worked at the plumbing and pipe fitting trade for more than one (1) year.

"Normal construction labor market" is defined to mean the following geographical area: all of Delaware County, Fairfield County, Franklin County, Hocking County, Marion County, Pickaway County, Union County, and Madison County, east of Route #38, not including the City of London, or any other jurisdiction awarded to the Union.

For the purpose of this Article XV, "resident" means a person who has maintained a permanent home in the above defined geographical area for a period of not less than one year, or who, having had a permanent home in this area, has temporarily left with the intention of returning to this area for a permanent home.

Reasonable intervals of time for journeyman's examinations shall be no less than six (6) months after a qualified applicant requests such examination, provided the applicant has five (5) years' experience in the plumbing and pipe fitting trade. Failure to pass the examination shall exclude the applicant from retaking the examination for a period of one year, except that the Appeals Committee may rule otherwise.

(4) The Union shall maintain an "Out of Work List" which shall list the applicants within each Seniority Group in chronological order of the dates they qualify for employment. Each applicant must be available for employment within twenty-four (24) hours after notice is given by the Union. Applicants for referral must renew their applications at least every thirty (30) days in order to maintain their place on the Out of Work List. Any applicant who is referred to an Employer for a stated job of five (5) days or less duration shall be returned to his appropriate place within his Seniority Group and shall be referred to other employment in accordance with the position of his Group and his place within the Group. The Business Manager shall give each applicant for employment, who is referred to an Employer, a referral slip showing his name, address, date of referral and such other information as may be deemed necessary. If the applicant is not hired by the Employer, the Employer shall sign the slip and return it to the applicant, who shall in turn, give it to the Union when he returns to the Union Office. If the applicant is hired by the Employer, the Employer shall, within twenty-four (24) hours, mail the referral slip back to the Union showing the date the applicant started to work. Each Employer shall promptly notify the Union when any employee is terminated. No applicant for employment shall be placed on the Out of Work List until termination notice is received from the last Employer.

(5) Employers shall advise the Business Manager of the Local Union of the number of applicants needed. The Business Manager shall refer applicants to the Employer by first referring applicants in Seniority Group I in the order of their places on the Out of Work List and then referring applicants in the same manner, successively, from the Out of Work List in Seniority Group II and then Seniority Group III. Any applicant who is rejected by the Employer shall be returned to his appropriate place within his Seniority Group and shall be referred to other employment in accordance with the position of his Seniority Group and his place within the

Seniority Group. The only exceptions which shall be allowed in this order of referral are as follows:

(a) When an Employer states bona fide requirements for special skills and abilities in his request for applicants, the Business Manager shall refer the first applicant on the register possessing such skills and abilities.

(b) When an Employer requests particular plumbers or pipefitters previously employed by the Employer who have been laid off or terminated by the Employer ninety (90) days previous to the request.

(c) If the age ratio clause in the Agreement calls for employment of an additional employee or employees on the basis of age, the Business Manager shall refer the first applicant on the register satisfying the applicable age requirements.

(d) When an employee who has satisfied the standards established by this referral plan becomes an officer in the Union and is required to spend full time in that office for a specified period, each employee will retain and accumulate his employment qualifications under this Agreement.

(6) An "Appeals Committee" is hereby established composed of three members of the Labor Management Committee representing the employer and appointed by the Mechanical Contractors Association of Central Ohio, Inc., three members of the Labor Management Committee representing the employees and appointed by the Union and one public member selected by the aforementioned six members. In the event that the six members cannot agree on the selection of the public member, they shall petition the United States District Court for the Southern District of Ohio, Eastern Division, for the appointment of such public member. It shall be the function of the Appeals Committee to consider any complaint of any employee or applicant for employment arising out of the procedures set forth in this Article XV. The Appeals Committee shall have the power to make a final and binding decision of the above matters. The Appeals Committee is authorized to issue procedural rules for the conduct of its business, but it is not authorized to add to, subtract from, or modify any of the procedures of this Article XV and its decision shall be in accordance with this Article XV.

(7) A copy of the referral procedure set forth in this Agreement shall be posted on the bulletin board of the offices of the Union and in the offices of the Employers who are parties to this Agreement.

(8) Every shop employing six (6) or more journeymen, for every six (6) journeymen, one (1) shall be fifty-five (55) years of age or over, if available.

### ARTICLE XVI. SENIORITY AND LAY-OFF.

(1) This article shall apply to those employees registered and placed in the Seniority Groups set out and described in Article XV.

(2) For the purposes of lay-off, there is to be no seniority within a Seniority Group and seniority for employees shall be confined to designated Seniority Groups, i. e.;

i. Employees registered and placed in Seniority Group I shall have seniority over employees registered and placed in Seniority Group II.

ii. Employees registered and placed in Seniority Group II shall have seniority over employees registered and placed in Seniority Group III.

(3) In the event that an Employer finds it necessary to lay off employees, such lay-offs shall be made in accordance with the following procedure:

i. Employees in Seniority Group III shall be laid off before employees in Seniority Groups I and II, inclusive, are laid off.

ii. Employees in Seniority Group II shall be laid off before employees in Seniority Group I are laid off.