**UNITED STATES of America**

**v.**

**LOCAL 638, ENTERPRISE ASSOCIATION OF STEAM, HOT WATER, HYDRAULIC SPRINKLER, PNEUMATIC TUBE, COMPRESSED AIR, ICE MACHINE, AIR CONDITIONING AND GENERAL PIPEFITTERS, et al., Defendants.**

**No. 71 Civ. 2877.**

United States District Court,
S. D. New York.

July 7, 1972.

Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., for United States of America by Daniel H. Murphy II, Joel B. Harris, New York City, of counsel.

Doran, Colleran, O'Hara & Dunne, New York City, for Local 40 and others by Robert A. Kennedy, Richard O'Hara and Ronald E. Guttman, New York City, of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendant Allied

Building Metals Industries by Michael A. Cardozo, New York City, of counsel.

GURFEIN, District Judge.

This is an action brought by the Attorney General of the United States in a complaint signed on July 29, 1971 under the Civil Rights Act of 1964 pursuant to authority granted to the Attorney General in that Act (Act of 1964, 42 U.S.C. § 2000e–6(a)). The defendants were four local unions in the building trades servicing metropolitan New York and their counterpart Joint Apprenticeship Committees and employee associations. By order of this Court, separate trials were ordered for each local union and its counterparts.

A separate trial has now been had to the Court in the case against Local 40, International Association of Bridge, Structural and Ornamental Iron Workers ("Local 40"), the Joint Apprenticeship Committee, Iron Workers Local 40 and 361 ("JAC") and an employer's association, the Allied Building Metal Industries ("Allied Metal"). [1] Decision was reserved.

### THE COMPLAINT

The complaint alleges that Local 40 is engaged in a pattern and practice of discrimination in violation of Title VII of the Civil Rights Act of 1964. It charges that Local 40 which has approximately 878 members [2] has only fifty non-white members (¶12). All individuals employed by members of Allied Metal as structural iron workers must be members of Local 40 or hold valid work permits issued by Local 40. The JAC trustees are representatives of employers and union and they control the apprenticeship program for Locals 40 and 361 and determine which persons shall be admitted to the apprenticeship program (¶14).

The pattern and practice of resistance to the full enjoyment by non-whites of

---

1. Allied Metal is joined as a defendant for purposes of relief only pursuant to Fed.R.Civ.P. 19(a) (1).

2. The Government now shows that there are 1229 members, but the union shows 244 of these are honorary or pensioners.

rights secured to them by 42 U.S.C. § 2000e–2(c) and § 2000e–2(d)[3] are alleged to consist, *inter alia*, of the following: (a) failing to admit non-white workmen into the union as journeymen members on the same basis as white; (b) failing to refer non-white workmen for employment on the same basis as white by applying standards of referral which have the purpose and effect of insuring referral priority to their members; (c) failing to recruit "blacks" for membership in and employment through the union on the same basis as whites are recruited; (d) failing to permit contractors to fulfill the affirmative action obligations imposed by Executive Order 11246 by refusing to refer blacks whom such contractors wish to employ; and (e) failing to take reasonable steps to make known to non-white workmen the opportunities for employment, or otherwise to take affirmative action to overcome the effects of past racially discriminatory policies and practices.

## THE HISTORY

Local 40 is a hard-hat union of structural steel workers whose members were braving the heights of rising skyscrapers long before the hard-hat was used. Created in 1904, its members shared the prejudices of their time, stuck largely to their ethnic stock and surely discriminated against black persons, among others. Like most prejudice, it was probably made to appear justified on economic grounds of self-survival by otherwise decent hard-working folk. The union fostered nepotism and was, on the whole, a family oriented group. In this respect, Local 40 was probably not different from the other construction unions across the land.

It is unprofitable to assay in retrospect the relative strength of each of the coalescing factors that spelled discrimination. The net effect, suffice it to say, was an ugly discrimination against black workmen. It is this effect that the Congress sought to eliminate, or at least ameliorate, through the Civil Rights Act. The evils were well known and labor unions were singled out as special targets in the legislative desire to end discrimination in employment.

When the Civil Rights Act became effective in 1965, Local 40 had one black member, and he had been admitted toward the end of 1963, and one person of Spanish ancestry, admitted in 1948. That this was tokenism is apparent. But the union cannot legally be charged with discrimination practiced before the Civil Rights Law was enacted. It can only be charged with what it has done or failed to do since then. One must bear in mind, however, that we do not start with a clean slate, but with a chronic condition which it will obviously take some strong affirmative action to improve.

The union, in simple terms, contends that it has set itself to the task with a

3. § 2000e–2(c):
"Labor organization practices.
It shall be an unlawful employment practice for a labor organization—
(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
(2) to limit, segregate, or classify its membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."
§ 2000e–2(d):
"Training programs.
It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training."

will and that it deserves no censure for its efforts. The Government, to some extent at least, must grudgingly concede that there has indeed been some progress, but it maintains that the pace is too slow, that foot-dragging continues, and that the proof of the pudding is in the statistics. The union appears reluctantly to accept the use of statistical measurements, although it rightly argues that statistics alone should, in no event, be wholly determinative of its conduct. The Government stresses the results viewed objectively, while the union stoutly maintains that the asserted purity of its motives and its recent conduct must weigh heavily in the scale in favor of exculpation. With this background, let us try to see what has happened since 1965 when the Civil Rights Act came into being.

## FINDINGS OF FACT

1. Local 40 is a labor organization within the meaning of 42 U.S.C. § 2000e(d). It has more than 100 members and maintains a hiring hall, and is in an industry affecting commerce. (Stipulated)

2. JAC is a joint labor management committee within the meaning of 42 U.S.C. § 2000e-2(d). (Stipulated)

3. Local 361 is a sister union of the same International whose jurisdiction covers Kings, Queens, Nassau and Suffolk Counties, while Local 40's jurisdiction covers Bronx, New York, Westchester and Richmond Counties. The craft jurisdiction is the same for both locals. (Stipulated)

4. In 1965, Local 40 had one black member, admitted in 1963 and one Puerto Rican member, admitted in 1948. (Stipulated).

*Union Membership—"Bookmen v. Permitmen."*

5. There are two classes of workmen who may be employed under the industry-wide collective agreement. These are full fledged members of Local 40 in good standing—the "bookmen"; and journeymen from other locals as well as workmen some of whom are equivalent in capacity to "bookmen" or possess skills necessary for a particular job assignment, but who have no union affiliation—the "permitmen." (Tr. 297–298: Ct. Ex. 1)

6. These men, if they get a job in the industry on their own or through the hiring hall, are permitted to work, after they get the job, under a permit granted by the union upon payment of a fee of $2.50 per week to the union. (Tr. 27).

7. They receive the same pay scale as the bookmen, and receive certain fringe benefits like vacation pay. The permitmen generally get their jobs through the union hiring hall. (Tr. 221–22)

8. Under the charter of the International Union permitmen must be qualified journeymen (Ex. FF50).

9. A welder certified by the City of New York may get a permit to work even though he is not qualified as a journeyman (Tr. 320–21), and there is a separate column on the daily hiring hall sheet where a workman can signify that he is a welder (Id.).

10. To be admitted to membership in any local union of the International, one must be a practical workman versed in the duties of some branch of the trade, of good moral character and competent to demand standard wages (Ex. 3, Constitution, Art. II, 2).

11. There is no record kept of the number of permitmen nor of the ratio of permitmen to bookmen.

12. By extrapolating the weekly cash receipts from the $2.50 permit fee, one may, however, reasonably deduce the number of permitmen in a given period. The Government has attempted to do this and has arrived at an average of 580 permitmen, a figure I can accept as a fair approximation (Ex. 48A, Tr. 361, 298–301).

13. There were 1229 members of Local 40 at the end of April 1972, of whom 86 are apprentices. The active bookmen

number about 903, the rest being honorary and pensioners (224 men) (Ex. 60). This means that the actual working population in this craft within the four counties included in the Local 40 jurisdiction is about 1480 persons, all of whom have the apparent capacity to do the work required, plus apprentices.

14. Not all of the 580 permitmen are seeking membership in Local 40, for many of them are members of other locals in the International. Of the non-members of Local 40 who applied for referral in the months of May and December 1971, out of a total of 1114 persons listed, 708 or 63% were not members of other locals (Ex. 34). The figure may be of little significance because the same name is repeated many times on the successive daily sheets when the person continues to be out of work. It tends to show, however, that, in aggregate, there are a considerable number of permitmen, apparently qualified to work, who are not members of the International union.

15. At the end of April 1972, the total non-white membership of Local 40 consisted of 40 "black" persons, 16 "with Spanish surnames," 6 "Orientals" and 66 "American Indians." There were 86 apprentices of whom about 14 (estimated) are black and Puerto Rican (Ex. 9, EEO–2 form for 1971, Part E; Ex. 11, Local 40 Membership Certificate for September 1971; Tr. 297 and Ct. Ex. 1).

16. That adds up to 128 non-whites out of 989 (including apprentices), or about 12.9%. Excluding the 66 Indians, however, the black and Puerto Rican group constituted 6.3% against the total population figure derived below of 23.9%.

17. The related population figures for the eight counties which are included within the jurisdiction of Local 40 and its sister union Local 361 (which

have a joint apprenticeship and joint job rights program) are the following:

| | |
|---|---:|
| Total male population | 5,368,436 |
| Negro male population | 854,933 |
| Puerto Rican males (½ of total Puerto Rican population) | 429,978 |
| Combined Negro and Puerto Rican male population | 1,284,911 |

(U. S. Bureau of the Census, Census of Population: 1970, General Population Characteristics Final Report PC(1)–B34, Table 35, New York; Puerto Rican male population estimated from Pltf. Ex. 58A).

This indicates that Negro and Puerto Rican males are 23.9% of the total male population of the eight counties.[4]

18. On the other hand, there has been a positive increase in "membership" in Local 40 (excluding Indians) for blacks and Spanish speaking persons from 2 to 56, or 2800% in seven years.

19. We do not know the racial composition of the permitmen for they are a shifting group and records are not kept by race.

20. The method for electing journeymen to union membership as bookmen is, on its face, suspect. The applicant fills out a form which is readily given to all. He then is interviewed by the Executive Board of the union, all white, which determines whether his experience qualifies him to take the examination for membership. Only if he passes muster, can he take an examination given by an examination committee of the union, all white. The emphasis is on a practical test with no set form. There is also a written examination. No independent agency reviews the results (Corbett Dep. Ex. 47, pp. 104–09). Nor is there any written rule for processing the applications (Place Dep. Ex. 44, p. 70).

21. The written test is prepared by the coordinator of the JAC from books prescribed for apprentice training. The practical test consists of rigging up a block and tackle, pointing out the parts of a guy derrick from a blueprint; and

---

4. The Court has taken only male population figures because there is no evidence that the Women's Liberation Movement has yet reached the level of the skyscraper.

tieing up a number of knots and hitches using a piece of line and a two-by-four piece of wood (Place Dep. Ex. 44, p. 74).

22. The examinations are job-related.

23. In July 1966 there were 1048 members plus 62 apprentices for a total of 1110. Of these, 833 were journeymen and 215 "retired." In July 1971 there were 1137 members and 87 apprentices, a total of 1224, of which there were 903 journeymen and 234 "honorary and pensioners." In 5 years, then, the membership rose from 1110 to 1224, an increase of 114, and 155 vacancies were filled, making a total of new members of 269, except that there were 25 more apprentices at the end of the period, making the true figure 244. By extrapolation I find that 42 of the new members were black or Puerto Rican, or about 17.2% of the members admitted (see Ex. 60).

24. There were 100 black iron workers on the World Trade Center (Tr. 370) and 17 of them, who were City certified welders, were given welder's books in Local 40 (Tr. 369). There is no evidence whether any of the other black men on that job were already members of Local 40 though there may have been some. The union claims credit for this showing. Mr. Corbett testified that he felt that black welders who had not had enough experience to pass the journeyman's examination ought, nonetheless, to be allowed into Local 40. Under the union Constitution, if a man failed the journeyman's examination he was no longer permitted to work. To forestall such a peril, Mr. Corbett arranged for such men after two years of work as welders to be given welder's book membership in Local 40 without examination (Corbett Dep. pp. 319, 321–22).

It would not be fair, in any event, to resolve the issue of "bookmen" membership without considering the steps the union has taken to fulfill the mandate to act affirmatively. This requires us to explore another ground for the Government's complaint—recruitment practices.

*Recruitment Practices*

25. Contemporaneously with the effectiveness of the 1964 Civil Rights Act, the industry and the unions bestirred themselves to form a Joint Apprenticeship Committee (JAC), the avowed purpose of which was to recruit and train apprentices for this skilled and hazardous trade. The Ironworkers' JAC is a common apprentice program shared by both Local 40 and Local 361 (Tr. 222).

26. Apprentices are indentured to the JAC for a period of years.

27. The creation of the JAC was a part of the collective bargaining machinery and the trustee representation was joint. A trust fund was created on July 1, 1966 whose purpose was "to provide training for apprentices pursuant to the Standards of Apprenticeship and Training adopted by the trustees and to provide training and skill advancement for journeymen" (Ex. 2 § 2). The trustees are empowered "to determine the number of apprentices to be initiated into the apprenticeship program, taking into consideration the need for apprentices in the locality, the available job facilities for acquiring the necessary experience, and other relevant factors" (Id. Art. V, 1(b)). But the upper limit is fixed by the ratio of apprentices to journeymen as provided in the regulations of the International Constitution.[5] It is incumbent on the trustees to establish minimum standards of education and experience required of apprentices and to pass on their qualifications, to arrange tests for determining the apprentice's progress in manipulative skills and technical knowledge and to arrange classes (Id.).

Decisions of the trustees are by majority vote requiring at least two concurring votes by union and employer trustees respectively. This has been amended to provide for unit voting.

---

5. We have been unable to find such a ratio in the collective bargaining agreement. Mr. Corbett testified that the ratio is one apprentice to seven journeymen (Tr. 243, but see Tr. 346).

To break a deadlock, a mutual person is to be selected by the trustees, or if they cannot agree, by the United States District Court for the Southern District of New York [6] (Ex. 2, Art. VII, § 5).

28. Standards of Apprenticeship have been promulgated. They provide that "selection of apprentices shall be made from qualified applicants on the basis of qualifications alone and without regard to race, creed, color, national origin, sex or occupationally irrelevant physical requirements in accordance with objective standards which permit review, after full and fair opportunity for application; and this program shall be operated on a non-discriminatory basis" (Ex. 8 § 7). An apprentice is required to work not less than 6000 hours of reasonably continuous employment in an approved schedule of work experience over a period of not less than three years, together with the required related instruction hours, consisting of an additional 144 hours each year. Upon successful completion, the apprentice is given a certificate as a journeyman.

29. Under this apprenticeship program the entering apprentice classes from 1968 through 1971 totalled 268, of whom 48 were black or Puerto Rican, or approximately 18% (Ex. 9).

30. A substantial percentage of the whites admitted to the apprenticeship classes are related by blood to journeymen members of Local 40 (about 30%) and presumably also to members of Local 361 (Place Dep. 206–09; 547–48).

31. While the figure of 18% shows a distinct improvement, it raises two questions: (a) whether the percentage is high enough to eliminate the earlier condition of discrimination, and (b) whether the high incidence of nepotism does not reflect a bias in the selection process.

32. The extent of nepotism cannot be determined unless one knows what percentage of the whites who *tried* to get into the program were blood relatives compared with the total number of white strangers. Second, there may be some hereditary factors, as there certainly are environmental factors, including motivation, which make the blood relative more likely to do well on the tests. But nepotism as a trade union policy is unhealthy, for while the rich may leave an inheritance for their children, the worker may not bequeath job seniority, for that will take a job from another who has no union "father." Nepotism tends to freeze out blacks because blacks do not have white relatives in the union.

33. The tests for admission to the program comprise four elements, scored as follows: Aptitude, 30; Physical, 40; High School Diploma or equivalent, 5; and Interview, 25 (Steinberg Dep. Ex. 46, p. 75).

34. While any test which includes an oral interview is presumptively suspect, the Government did not produce any evidence reflecting on the quality of the examinations, though some of the "personality characteristics important in apprenticeship" are susceptible to conscious or even unconscious discrimination (Ex. 46A; Subex–7).

35. There is evidence that white persons, even relatives, have failed the tests (Ex. H).

36. The tests have been administered by Stevens Institute of Technology for the mechanical aptitude test and by Professor Balquist of Columbia University for the physical test (Tr. 382). The tests are marked by the independent persons mentioned (Tr. 379–83; Ex. 46, pp. 24, 30–6). There has been no showing that the tests are not job related.

37. In the 1970 apprentice class examinations, 164 whites (out of 238 who had filled in application blanks) appeared for interview after passing the physical and aptitude tests. Of these 147 or 89% were accepted. 55 Black and Puerto Rican men (out of 106 who filled in the application blanks) appeared for interview after passing the physical and aptitude tests. Of these 40

---

6. Art. VII, § 5 was later amended but not substantially for present purposes.

or 72% were accepted. In so small a group (assuming individual differences not adjusted by random sampling) one can hardly find purposeful discrimination in these percentages without further evidence.

38. The Government has not adduced proof that blacks and whites bunched closely together in grades on the basis of aptitude and physical examinations have been graded in a discriminatory fashion on the oral interview.

39. Absent such proof, it would be unwarranted to assume discrimination based solely on *composite* results which include the scoring on the interview test.

40. The Government has not asked for a finding that the examinations were an "unnecessary barrier," to apprenticeship, for it is difficult to find evidence in this record to support that conclusion. (See Ex. 46A, 7; Steinberg Dep. pp. 51–7; Govt. Br. p. 6).

41. The only examination that is suspect from its very lack of objective standard, the oral interview, is to be eliminated in the future, according to Raymond Corbett, Business Agent of the union (Corbett Dep. 371).

42. Without any evidence, the Court cannot assume that the independent testing agencies conducted examinations that were not job related.

43. Non-white apprentices are affirmatively recruited by JAC. The program is made known to minority and community action groups who disseminate it to the black and Puerto Rican community (Steinberg Dep. 383–85). The Workers Defense League, one of the minority community action groups, in turn, has disseminated the information by radio, television and through local newspapers (Johnson Tr. 437–38).

44. The Government bases its essential claim of discrimination in the selection of apprentices on the "weeding out" process.

45. There is no doubt that 45% of the applications for the 1970 examination were issued to non-whites (Tr. 401–2), which tends to show a fair coverage of the minority community. The JAC claims credit for this result.

46. The Government notes that while only 54% of the persons who *received* applications were white, 85% of the first apprentice class out of the 1970 list was white, and 80% of the second class was white. I find the relevant figures to be not those who *received* application blanks but those who *returned* them filled in. That is, 238 whites against 115 all others. The whites returned 67% of the blanks, the true starting point.

47. Why people have a change of heart on enlisting in the program is not susceptible of direct proof. We assume that it is not an average person who is willing to climb a ten foot steel column fifty stories high. It may be that when the dimensions of the job are sketched ardor cools, and dropping out seems to some persons, white or black, more sensible than continuing. The Project Director for the New York Plan, himself a black, approved the requirement of a showing of motivation to avoid later disappointment (Johnson Tr. 439–41). A drop-out under these circumstances bears no stigma. Nor does the JAC for making the offer. In short, I find a lack of evidence to support a contention that the JAC, subtly or otherwise, encourages non-whites to drop out of the program.

48. The second part of the process—the tests themselves, obviously cannot guarantee a passing mark for all, nor for any ethnic or racial group, unless they are "fixed" or so devised as to over-emphasize information or skills that minority members are likely to possess.

49. Here there appears to have been a rejection of the use of verbal criteria that are unfair to those with a weaker education.

50. The union also suggests as another indication that its heart is in the right place: its voluntary participation in the New York Plan for the training of minority individuals who are ineligible for the apprentice program because they are overage (431–34). Here blacks

178

or Puerto Ricans are taken for training even though they are above the maximum apprentice age of 28; they are assigned to state and city jobs under the Plan, and when these jobs peter out, the union finds them private employment (Corbett Dep. 314–15).

51. There are 33 persons assigned to Local 40 under this program, of whom 15 are currently engaged on projects (Corbett Dep. 314–16).

52. Mr. Corbett testified at some length about these and other steps he had taken to procure more minority employment with the aim of making them union members. I was impressed with his sincerity and I cannot find that there has been purposeful discrimination in the apprentice program.

## COMMENT

■ It is not only active discrimination, however, that gives claim to relief. Unintentional discrimination also runs afoul of the law. In the words of Chief Justice Burger: ". . . [G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). See Chance v. Bd. of Examiners, 458 F.2d 1167 (2 Cir. 1972).

We now turn to the claim that the referral procedures of the union are discriminatory.

### The Referral Practice

53. The union operates a hiring hall. There bookmen, unaffiliated permitmen, and men from other locals shape up every morning to be assigned to such jobs as are available. The Assistant Business Agent in charge of the hiring hall receives calls from employers who tell him the number of men that are needed and whether they require any of the special skills listed in Finding 54.

54. The positions filled from the hiring hall vary in the requirements of experience, skill and agility. Most structural workers can do every phase of the work (Ex. 44, p. 8). In the construction of high rise buildings the jobs may be roughly categorized as follows: (1) a raising gang consists of six or seven men in the setting of structural steel (Place Dep. 32). This gang sets the steel. Its members must know how to work with cranes or derricks. They must be able to bolt up the steel and plumb the building up, read prints to know the steel is being put in the right place, and understand safety requirements (Ex. 44, Place Dep. 7–8). (2) A raising gang normally has two men working as connectors. The steel is sent up to them and they connect the horizontal piece and the vertical piece (Ex. 44, p. 13). There is also a foreman or "pusher" and a bell man who signals the engineer on the derrick, as well as a hooker on and a tag line man (Ex. 44, p. 26). (3) A demolition gang is similar to a raising gang, but they take a building down (Ex. 44, p. 29). (4) A plank man lays a floor between horizontal beams of steel set up by the raising gang (Ex. 44, pp. 20–21). (5) A decking gang welds a steel deck floor that is put down after the steel is raised and set (Ex. 44, p. 22). (6) A burner tailors the fabricated steel to the particular needs of the job (Ex. 44, p. 24). (7) Welders do the welding procedures. They must be certified by the City of New York (Ex. 44, p. 29). (8) A layout man prepares the insertion of reinforcing steel (Ex. 44, p. 34). (9) A bolter up gang follows the raising gang and puts permanent bolts in the structure in advance of the plank man (Ex. 44, p. 34). (10) A plumber-up plumbs the columns to make sure they are plumb with all the lower columns (Ex. 44, p. 36). (11) A hod hoist tower man constructs the temporary elevator on the side of the building that carries materials. A hod hoist tower gang consists of two ironworkers and two carpenters. (12) An all around bridge man can do all of

the above including welding (Ex. 44, p. 38).

55. The men looking for jobs sign their names on either of two sheets. One is marked "Local 40 only; " the other is for non-members of Local 40, and is marked "Permit-and other locals."

56. Anyone who is qualified as a journeyman or as a welder (in which case he signifies his specialty), regardless of race, may sign and wait.

57. He does not wait his turn, however, for the Business Agent makes his own determination of who goes where. Justification is offered for failing to follow the "first in first out" rule. It is said that employers often ask for particular men or at least men fitted to a particular job. And it is quite evident that, even without a formal rule, bookmen are referred to jobs ahead of permitmen or members of other locals. Mr. Place, the manager of the hiring hall, conceded that Local 40 men are sent out first (Place Dep. Ex. 44, p. 59).

58. This results in a *de facto* discrimination against blacks and Puerto Ricans because there are not enough of them in the priority status of bookmen. The power wielded by the director of a hiring hall is, in the absence of an ombudsman on the scene, very great indeed. His conscience, or the collective conscience of the business agents, is the sole censor of preferential treatment for those he favors. A court obviously cannot monitor such a referral system on a daily basis.

59. The evidence fell short of establishing actual discrimination in the referral procedure. Several black men testified that they waited long and wearily for weeks without being sent to jobs, but they could not tell whether the white men sent out were "book" men or "permit" men (Tr. 72, 88, 101, 111, 173–4, 289, 290). And blacks testified that they were sent out while white men were not (Tr. 78, 82, 110, 116; see Tr. 185). One can understand the anguish of the black man where he sees whites being sent out without class identification as part of a process that, at best, he cannot see or touch. Anyone who has waited in a strange physician's office knows the feeling of uncertainty whether some other person in the waiting room has not been called out of turn.

60. The union protests that its criteria are objective and unrelated to race. Since no lists are kept by race, one cannot reconstruct a day in the hiring hall.

61. Though the Government requires local unions which run hiring halls to report, by minority categories, the applicants for referral and the numbers referred, the evidence in this record is sparse. Only one of these EE03 forms in evidence is sufficiently filled in to be of some help. The form filed by Local 40 for the two month period October and November 1971 reveals the following (Ex. 9):

There were 1999 applicants for referral of whom 131 were "Negro and Puerto Rican" and 24 were "American Indians," a total of 155 minority persons who constituted slightly less than 8% of the total number of applicants. A total of 860 persons were "referred," of whom 42 were "Negro and Puerto Rican" and 10 were Indians, a minority total of 52. The white persons referred were, therefore, 808 in number against 1844 white applicants. The whites thus obtained 43% referrals, while the non-whites were given about 33% referrals. Put another way, although non-whites were 8% of the applicants, they constituted 6% of the referrals.

Even without considering that Local 40 *members* are preferred in referrals, the figures, if true, hardly show an active pattern and practice of discrimination in referral.

62. We do know, moreover, that there are about 580 journeymen and welders who have successfully sat in the hiring hall and obtained jobs by referral. Some of them, though not many according to visual testimony, are black and Puerto Rican. A substantial number have indicated their desire to join the union.

63. In summary, we find a situation in which honest efforts have been made by the union to ameliorate the condition of discrimination, but where the practice of referral still discriminates in favor of *union members* who, as a result of past policy, are predominantly white.

## DISCUSSION

In the light of the evidence available, there appears to be no active discrimination against blacks or Puerto Ricans in the apprenticeship program or in referrals from the hiring hall. Yet there is a residuum of discriminatory effect stemming from the earlier practices of discrimination, the failure to accelerate minority journeymen membership, and the continuance of a referral system that has a built-in priority for Local 40 journeymen members against all others in the hiring hall.[7]

■■ The absolute ratio of minority members in the union to the whole membership is, in relation to the matrix of population, of some significance. Statistical evidence can make a prima facie case of discrimination. Parham v. Southwestern Bell Telephone, 433 F.2d 421, 426 (8 Cir. 1970). " . . . [A] small black union membership in a demographic area containing a substantial number of black workers raises an inference that the racial imbalance is the result of discrimination . . ." United States v. Ironworkers Local 86, 443 F.2d 544, 551 (9 Cir.) cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971), citing United States v. IBEW, Local No. 38, 428 F.2d 144, 151 (6 Cir.) cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970). The question of what is a "small" membership in relation to black workers in a demographic area is a question of degree. A one-to-one ratio of membership to population is not required.

The *Ironworkers Local 86* case, *supra*, affords an illustration of the difference between the extreme situation there and the situation here. In that case, Judge Lindberg found that in January 1970, Local 86 had about 920 members, only one of whom was black; Local 32 had about 1900 members, only one of whom was black. The sheet metal workers JATC had 100 apprentices indentured in its program and only seven were black. Plumbers JATC had 104 apprentices and none were black. The situation confronting Judge Lindberg was like Local 40's situation in 1965. In his case, however, no progress had been made in more than four years.

In United States v. Sheet Metal Workers, 416 F.2d 123 (8 Cir. 1969), Local 36 had at date of trial, June 1967, 1275 white members and *no* Negro members. It accepted its second and third Negro apprentices in 1967. There was no record of any Negro having used its hiring hall prior to the date of trial. 416 F.2d at 128.

In United States v. IBEW, Local 38, *supra*, as of the date of the complaint the local union had 1318 members, of whom 2 were Negroes, and 255 apprentices of whom 3 were Negroes. In the preceding year it had referred 3487 persons for work through the hiring hall, only 2 of whom were Negroes. 428 F.2d at 151.

■ Although the statistics in the case of Local 40 do not compel a conclusion that there is present active discrimination, it is now clear that quite neutral practices which have the effect of discriminating because of past history impose a duty on the District Courts to change them. Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Louisiana

---

7. The hiring hall is sanctioned for the building and construction industry. 29 U.S.C. § 158(f). See Local 357 v. NLRB, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961). Preference may not be given to union members to pressure others to join. But that is not in issue here. Here the preference is alleged to be exercised without permitting minority persons to eliminate it by simply joining the local union.

v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); United States v. Bethlehem Steel Corp., 446 F.2d 652 (2 Cir. 1971); United States v. IBEW, Local No. 38, 428 F.2d 144 (6 Cir. 1970); United States v. Sheet Metal Workers, 416 F.2d 123 (8 Cir. 1969); Local 53 v. Vogler, 407 F.2d 1047 (5 Cir. 1969).

■ Although the Civil Rights Act appears to provide that preferential treatment (by a quota system) is not to be granted on account of existing number or percentage imbalance based on population ratios, 42 U.S.C. § 2000e–2(j), the courts have determined that the statute merely prohibits a requirement of "preferential treatment" *solely* because of an imbalance in racial employment existing at the effective date of the Act. United States v. IBEW, Local No. 38, 428 F.2d 144, 149 (6 Cir. 1970); Sheet Metal Workers, Local 36, *supra*; Dobbins v. Local 212, 292 F. Supp. 413 (S.D.Ohio 1968). If it were held otherwise, it would be too easy to draft seemingly innocuous provisions for membership or work referral which would, because of history, freeze blacks and other minority people into a perpetual state of inability to comply with them. See, e. g. Local 53 v. Vogler, 407 F.2d 1047, 1054 (5 Cir. 1969). The test is whether the practices in question have any present discriminatory *effect*. United States v. Dillon Supply Co., 429 F.2d 800 (4 Cir. 1970).

Chief Justice Burger in Griggs v. Duke Power Co., 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) said: "Under the Act, practices, procedures, or tests neutral on their face, *and even neutral in terms of intent,* cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices" (emphasis supplied).

■ In the present case one cannot escape the conclusion that the industry can employ, in normal times, more than the journeymen membership of Local 40. It appears that probably more than half of the non-members of Local 40 who appear in the hiring hall looking for work are unaffiliated. The artificial limitation of union or apprentice membership far below the number necessary for the particular trade is, itself, a discriminatory pattern or practice in a context involving a predominantly white union with a past history of discrimination. See Local 53 v. Vogler, 407 F.2d 1047 (5 Cir. 1969); United States v. Local 638, et al., 337 F.Supp. 217 (S.D.N.Y.1972); United States v. Local No. 86, 315 F. Supp. 1202 (W.D.Wash.1970), aff'd, United States v. Ironworkers Local 86, 443 F.2d 544 (9 Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

It is true that Local 40 has not specifically said that to obtain priority in referral one must have been employed for a number of years under the collective bargaining agreement as was the requirement in some other cases. Cf. Equal Employment Opportunity Commission v. United Association of Journeymen, etc., 311 F.Supp. 468 (S.D.Ohio 1970), vacated, 438 F.2d 408 (6 Cir.), cert. denied, 404 U.S. 832, 92 S.Ct. 77, 30 L.Ed.2d 62 (1971); United States v. Sheet Metal Workers, 416 F.2d 123 (8 Cir. 1969). In that sense there is not overt discrimination against blacks. But the effect of giving priority to Local 40 members in referral is the same, because of the racial imbalance in membership. Without court intervention, even the voluntary acceleration of minority membership could be matched by equivalent new white membership, thus retaining the relative status quo.

■ On the other hand, to grant an absolute preference in employment to minority persons, which has the effect of depriving employment of white persons of higher qualifying standing may itself be unconstitutional. The Eighth Circuit was recently confronted with this difficult problem in a civil rights case under 28 U.S.C. §§ 1331, 1343(3) and (4), Carter v. Gallagher, 452 F.2d 315 (8 Cir. 1971), modified after rehearing en banc (1972). The District Court had

182

ordered the Fire Department of Minneapolis to give *absolute preference* in Fire Department employment to twenty minority persons who meet the qualifications for the position. A panel of the Court of Appeals reversed the order upon the ground that it unconstitutionally discriminated against whites under the Fourteenth Amendment and § 1981 of 42 U.S.C.A. The Eighth Circuit, sitting in banc, held that such an absolute preference "does appear to violate the constitutional right of Equal Protection of the Law to white persons who are superiorly qualified." 452 F.2d at 328. It distinguished cases where particular minority persons had been discriminated against and considered that the immediate employment of such persons could be ordered. But "in dealing with the abstraction of employment as a class," *id.*, the constitutional problem does arise. Although theirs was not a Title VII case, the Court accepted as practical guidelines remedies fashioned in Title VII cases. It then noted that the Ninth Circuit had approved a decree ordering building construction unions to offer immediate job referrals to previous "racial discriminatees" and also had approved a protective order requiring the unions to recruit sufficient blacks to comprise a 30% membership in their *apprenticeship* programs. United States v. Ironworkers Local 86, 443 F.2d 544 (9 Cir.) cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971). It also cited instances under Executive Order No. 11246 where *percentage* goals for the employment of minority workers were sustained. The Court then noted that "the presence of identified persons who have been discriminated against is not a necessary prerequisite to ordering affirmative relief in order to eliminate the present effects of past discrimination." 452 F.2d at 330. To accommodate the "conflicting considerations" the Court said: "[W]e think some reasonable ratio for hiring minority persons who can qualify under the revised qualification standards is in order for a limited period of time, or until there is a

fair approximation of minority representation consistent with the population mix in the area." The Court was careful to state that this was not a "quota" system, because as soon as the order is fully implemented, all hirings would be on a racially non-discriminatory basis. *Id.* The Court of Appeals, therefore, determined that one out of three persons hired by the Fire Department shall be a minority person until at least twenty minority persons are hired.

This extensive discussion of Carter v. Gallagher is warranted, perhaps not only because it is so recent, but because it points up the delicate constitutional discrimination that can be involved in the granting of absolute preferences.

The case of admission to membership in a labor union is, however, a step removed from the civil service list in a municipality. Here there is no state law, as there is in civil service, mandating the order of appointment from a list based on relative qualification by examination. Nor is membership in a union equivalent to actual appointment or employment. It is a step to employment and, while in the long run an increase in membership may mean less jobs for whites as a group, it does not penalize a particular white who has a priority status for a particular vacancy. It is, therefore, easier, in a union membership case, to adopt a ratio of minority to non-minority increase in membership until a relative balance is achieved.

RELIEF

There are several possibilities for relief: (a) to require the union to appoint an ombudsman for minority workers; (b) to abolish the priority status of bookmen and put everyone in the hiring hall on a "first in first out" basis; or (c) to increase the union membership enough so that there would no longer be any group discrimination even if the present referral practice is kept.

While the idea of requiring an ombudsman has occurred to the Court, *sua sponte*, it could cause difficulty in the

smooth working of the referral system. For there must be an element of judgment in determining which workman fits which job, and one can prophesy endless disputes on a matter so incapable of resolution by objective standards.

The same difficulty attends the strict application of a "first in, first out" rule which would make a single list of bookmen and permitmen and send them out in the order of signing in. A single list could be ordered, it is true, with a direction to the hiring hall manager not to discriminate in favor of members. This method, even if it were enforceable by a court, in a practical sense, would discriminate against bookmen (including the black, Puerto Rican and Indian bookmen) in favor of the permitmen, most of whom are also white.

The practical answer is to increase the non-white membership in Local 40. While there is no mandate to achieve a precise racial proportion to the population, the difficulties inherent in the referral system and the numerical inadequacy of the apprenticeship and training programs, regardless of fault, indicate that at the present rate it will be long before a rough equality is achieved. But more important, there are blacks and Puerto Ricans *now* who are presumably qualified journeymen, as evidenced by their acceptance as permitmen, and who want to join Local 40. Objective examinations should be open to them at once.

## CONCLUSIONS OF LAW

1. Local 40 is a labor organization within the meaning of 42 U.S.C. § 2000e(d) and is engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(e).

2. Ironworkers JAC is a joint labor-management committee controlling apprenticeship training within the meaning of 42 U.S.C. § 2000e–2(d).

3. The Court has jurisdiction over this action by virtue of 42 U.S.C. § 2000e et seq. The Attorney General is authorized under the Civil Rights Act of 1964 to institute suit to enjoin a pattern or practice of discrimination and request such relief as may be necessary to insure the full enjoyment of rights described in Title VII. 42 U.S.C. § 2000e–6(a).

■ 4. The Government has established a *prima facie* case that defendant Local 40 has pursued a pattern and practice of conduct with respect to employment opportunities in the construction industry which has, in effect, denied to black and Spanish-surnamed workers the same opportunities available to whites.

■ 5. Local 40's policies for admission of members and for referrals for work, which the Government has established as having the effect of perpetuating past discrimination, are unlawful.

■ 6. Local 40's policy of keeping its membership small in order to guarantee work opportunity for its present members has the effect of perpetuating past discrimination and is, therefore, unlawful.

■ 7. The admissions procedures to the apprenticeship training programs run by defendant JAC, do not discriminate against black and Spanish-surnamed applicants.

8. The past and present pattern of membership of Local 40, the practice as to work referral employed in the hiring hall run by Local 40, and the practice by which Local 40 admits persons to membership in effect discriminate, with regard to employment opportunity, against black and Puerto Rican individuals by reason of their race, color and national origin.

9. Plaintiff, United States of America, is entitled to judgment ordering the following:

## UNION MEMBERSHIP RELIEF

■ 1. All resident black and Puerto Rican city certified welders shall, upon application, promptly receive a welder's book in the union.

2. They shall also have the right to take the journeyman's examination, in-

dependently administered, on payment of equivalent dues and initiation fees, after 2 years of work, consisting of at least 1000 hours.

■ 3. All other resident blacks and Puerto Ricans with 3 years' experience, consisting of at least 1200 hours, shall be permitted, upon application, to take the impartial journeyman's examination, provided for below, the experience to be verified by the impartial examiners. Experience outside New York City or on non-union jobs shall be accepted as stated by the applicant, subject to post-examination check.

4. The term "Puerto Ricans" shall include former residents of the Carribbean area and Central America.

5. There shall be three examiners who shall constitute the examining board: one from the Engineering School Faculty of Columbia University; one from the faculty of Stevens Institute; and one from an accepted aptitude testing service. They shall be nominated to the Court by the Government and Local 40, and if the parties cannot agree, the Court will appoint them.

6. The union shall pay the fees of the impartial examiners.

7. The tests shall be job related and the examiners shall perform what in their discretion may be necessary validating procedures.

8. Only blacks and Puerto Ricans, and those whites whose applications for book membership are pending at the date of this opinion shall be eligible for the first examination.

9. All who pass the first examination shall be initiated to membership in the Local without a vote by the membership upon their payment of equivalent dues and initiation fees.

10. The date and qualifications for taking the examination shall be publicized in minority media with the statement that it is open at this time only to blacks and Spanish name persons, as well as to those white persons who have applications pending at the date of this opinion.

11. Notice of the holding of the examination shall be sent to all permitmen whose addresses are known, so that minority persons among them will learn of the examination and the qualifications therefor, including the status of race and national origin mentioned above. The Govenment may review the lists compiled by the local union and suggest additional names which should properly be on the list.

12. A failure to pass the examination shall not deprive the man of his right to continue to work as a permitman, unless the examining board finds him so unskilled that it is unproductive for an employer to hire him or that he is a hazard to himself or others.

13. Similar examinations for journeymen book membership, based upon the foregoing qualifications, shall be held at least every six months for the next four years (with adequate notice to file applications therefor), under the supervision of the independent examiners or their successors. Each applicant who meets the prerequisites for taking the examination shall be given at least two weeks' notice of the date and place of examination and the nature of the examination.

14. The Court reserves jurisdiction to pass on the validity of the examination and the procedures for notice, upon application by either party.

15. Local 40 shall maintain, for two years after any examination, complete records of the examination, including, but not limited to, all applications for membership; copies of all notices sent to applicants; copies of any replies received from applicants; copies of the examination administered and score sheets for the examination; and if the examination is practical, summaries of the applicant's performance detailed enough to allow independent review.

## REFERRALS

■ 1. All applicants for referral to jobs including members of Local 40 shall fill in a master card which permits checking, by job categories, those jobs

for which the applicant considers himself qualified. The master card shall include spaces for address, age, race or nationality, whether applicant owns a car, and any special license he may possess, such as a New York City Certified Welder's Certificate. It shall also provide for a statement of years of experience in the structural steel industry, with the names of former employers.

2. The Business Agent of Local 40 or either of his assistants shall mark the applicant as "qualified" or "not qualified by experience" for each category of the jobs described on the master card. Such evaluation shall appear in writing on the master card of each applicant, with the date of evaluation. If the Business Agent or his assistants cannot make such evaluation as to a particular applicant, they shall note in the job category "unknown" together with date. If the Business Agent or his assistants believe the applicant unfit for a particular job category because of age, lack of experience or for other reasons, the evaluation shall be stated in writing, the reason being particularized.

3. The first time an applicant for referral visits the hiring hall, he shall be required to fill in the master card as a prerequisite to job referral.

4. The master cards shall be retained as a permanent record in the hiring hall, and any applicant for referral shall, upon request, be shown his own master card and the evaluation of the business agents. He shall be given an opportunity, if he so requests, to challenge the evaluation of the business agents and they shall afford him a fair hearing.

5. All requests by contractors for work referrals shall be recorded in a bound book which shall reflect: (a) the date of the request; (b) the person and the firm making the request; (c) the nature of the request; (d) the address of the job; and (e) the names of the persons assigned pursuant to said request, with a notation of color or national origin (which may be visual if applicant refuses to state).

6. The work referrals shall be made without regard to race, color or national origin, and with reference only to job experience and qualification.

7. Until the successful applicants for the first examination described above shall have been initiated, the present practices of referral shall be suspended. That is, no priority shall be given to book members of Local 40 until further order of the Court.

8. All persons referred for employment must appear in person at the hiring hall.

9. After the initiation of new minority members aforesaid, based on the first examination, Local 40 may apply to the Court for a modification of the order respecting referral practices.

The United States and Local 40 shall confer on the drafting of an order in conformity with this opinion. If the parties cannot agree, each party shall submit an order upon notice. If a further discussion with the Court is required, the parties may make such request.

The foregoing numbered paragraphs are the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Submit order as above provided.