UNITED STATES of America,
Plaintiff-Appellant,

v.

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL NO.
38; Electrical Joint Apprenticeship and
Training Committee, Defendants-Appellees.

No. 19658.

United States Court of Appeals,
Sixth Circuit.

June 19, 1970.

David L. Rose, U. S. Department of Justice, Washington, D. C., Jerris Leonard, Asst. Atty. Gen., Gregory E. Fischbach, Gary J. Greenberg, Arthur D. Wolf, Attys., U. S. Department of Justice, Washington, D. C., on the brief, for appellant.

Thurlow Smoot, Cleveland, Ohio, for appellees.

Before PHILLIPS, Chief Judge, and EDWARDS and PECK, Circuit Judges.

EDWARDS, Circuit Judge.

On July 2, 1964, the following federal statute was adopted as a part of the Civil Rights Act of that year:

"(c) *Labor organization practices.*

"It shall be an unlawful employment practice for a labor organization—

"(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

"(2) to limit, segregate, or classify its membership, or to classify or fail to refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

"(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

"(d) *Training programs.*

"It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training." 42 U.S.C. § 2000e–2(c) (1964).

These provisions became effective as to this union July 2, 1965. 42 U.S.C. § 2000e note (1964).

In the opinion which decided the instant litigation in the United States District Court for the Northern District of Ohio, Eastern Division, the District Judge included a table showing the racial composition of the membership of defendant Local 38 of the International Brotherhood of Electrical Workers. That table follows:

| Date | White | Negro |
| --- | --- | --- |
| Jan. 1, 1957 | 1049 | 0 |
| Jan. 1, 1960 | 1101 | 3 |
| Jan. 1, 1965 | 1292 | 2 |
| July 1, 1967 | 1316 | 2 |
| Oct. 1, 1967 | 1329 | 3 |
| Sept. 25, 1968 | 1331 | 4 |

The Attorney General of the United States initiated this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–15 (1964), as amended, (Supp. IV 1965–68), on August 8, 1967. The complaint alleged that in violation of the statute just cited, defendants had engaged in and were engaging in racial discrimination by excluding Negroes from union membership and by discriminating against them in the union-operated work referral system, in the joint union-contractor apprentice program, and in the contractor affiliation program. Defendants denied these charges generally, and specifically denied any such discrimination after the effective date of the Act.

The District Judge found that there had been an historic pattern of racial discrimination in the operations of Local 38 and the Electrical Joint Apprenticeship and Training Committee (EJAC); that such discriminatory practices had continued after the effective date of the Civil Rights Act in the union-operated employment referral system; that while there was evidence that raised a "strong suspicion" of discrimination in the apprentice selection process following the effective date of the Act, such evidence was insufficient to support a positive finding of discrimination; and that the evidence did not support findings of post-Act discrimination in relation to union membership and contractor affiliation.

He further found that under a new union local leadership, which came into office after the filing of the complaint in this case, all discriminatory practices had stopped as a result of good faith efforts on the part of the new administration of the local to follow the Act. The District Judge entered a judgment enjoining any continuation of discriminatory practices in the referral system. He specifically refused to order affirmative relief designed to alleviate the continuing effect of the past discriminatory practices. He also refused the government's request that the court retain jurisdiction of the case.

The government has appealed, contending primarily that the relief afforded was inadequate to effectuate the purposes of the Act. We reverse.

The District Judge in an 87-page opinion analyzing this case, relied heavily upon United States v. Sheet Metal Workers Int'l Ass'n, Local 36, 280 F. Supp. 719 (E.D.Mo. 1968). This case, which dealt with similar claims of discriminatory practices on the part of an IBEW local in St. Louis (as well as a Sheet Metal Workers Local), has now been reversed in a decision of the United States Court of Appeals for the Eighth Circuit, United States v. Sheet Metal Workers Int'l Ass'n, Local 36, 416 F.2d 123 (8th Cir. 1969). We believe Judge Heaney's opinion represents a sound interpretation on the critical sections of the Civil Rights Act of 1964 and regret that the District Judge did not have the benefit of its reasoning.

### STATEMENT OF THE CASE

The defendant local union (Local 38 of the IBEW) is a construction trades union which has jurisdiction over the electrical trades in the construction industry in the area of Cleveland, Ohio. Defendant, Electrical Joint Apprenticeship and Training Committee, is a union-management controlled committee which operates a training program for electrical trade apprentices in the same area. The union and the industry each have three members on the committee which controls apprentice selection and training. It operates in the union hall.

Local 38 has about 75% of the construction industry in the Cleveland area under contract and by union-industry agreement it operates a hiring hall and referral system for the organized portion of the industry. Under its referral practices and the collective bargaining agreement, all eligible journeymen electricians who are members of Local 38 are referred out first before any other persons desiring to work in the electrical trades are referred for jobs.

There are two methods of becoming a journeyman electrician. The first is through acceptance in and completion of the apprentice training program operated by defendant EJAC. The second method of becoming a journeyman is by taking a journeyman's examination given by the union. No such examination had been given except in the year 1959, when it was administered to 24 white applicants, all of whom failed.

The complaint filed by the United States alleged an historic practice of discrimination against Negroes in relation to selection of apprentices, in work referral, and in union membership before the effective date of the Civil Rights Act of 1964. It also alleged that these discriminatory practices continued in somewhat altered form thereafter.

The District Judge found that prior to the effective date of the Civil Rights Act, both defendant Local 38 and defendant EJAC discriminated against Negroes on account of race—the union in its work referral practices and its membership admission practices, and the EJAC in its selection of apprentices.

As to the post-Act practices, the District Judge also found:

#### The Membership Findings

"The Government contends that as the union has practiced discrimination in the past administration of its

apprenticeship classes that all Negroes over apprenticeship age are forever excluded from membership and that continued refusal to directly admit Negroes over apprenticeship age violates Section 703(c) (1) of the Act, 42 U.S.C. § 2000e-2(c). This argument is not correct, for it ignores the realities of the possibility of Negroes over apprenticeship age achieving membership through the referral system. * * *

* * * * * *

"While the fact that there has been no such test for several years is true, the failure to administer such a test cannot be considered discriminatory. It was not until the summer of 1967 that any substantial numbers of Negroes began to work under the jurisdiction of Local 38 through the referral system."

A new union leadership was elected in June of 1967, virtually on the eve of the trial. As to giving the test the District Judge held that:

"[T]hey determined to do so at a time when there were enough Negroes qualified to take the test under the existing standards so as to make it meaningful as a practical matter. * * *

"It would thus appear that the initial failure to administer the test for Group One [resident journeymen] status subsequent to July 2, 1965 could not have affected the employment opportunities of Negroes and that the fact that the test has not yet been given is not racially motivated. While the fact that there were not sufficient Negroes working under the auspices of Local 38 to make the granting of the examination meaningful may itself involve racial discrimination, that is not the question here under consideration and it will be dealt with in considering the referral system.

"It is therefore this Court's conclusion that the plaintiff has failed to prove a pattern and practice of racial discrimination on the part of Local 38 by its * * * failure to date to administer the test for Group One which will open the door for an application to journeyman membership.

"Were it not for the fact that the defendant union is pressing to go forward with the Group One test, the Court would issue an order requiring it to do so, for a continuing failure to administer such test would constitute a discriminatory practice remediable under Title VII. * * * *"

*The Work Referral Findings*

"Although the 2–B [unskilled whites] category was formally discontinued as of June 1, 1965 plaintiff introduced documentary evidence indicating that thereafter Local 38 continued to refer men for work who did not have the requisite experience. Exhibits were introduced containing referrals of both white members of other unions and white nonunion members whose referral application, it is contended, did not reflect one year's experience as electricians. The Court has examined these exhibits, and finds that contained therein are referrals of unqualified whites, although not all the documentation therein supports the plaintiff's contention.

"William Hirsch, who was a union business agent up to July, 1967, admitted that if there was a demand for help that he could not meet with qualified electricians he would refer unexperienced persons. It appears that men so referred would be used to perform manual labor jobs.

* * * * * *

"There is evidence in the record to indicate that Local 38 had engaged in discrimination in the administration of the referral system. The record further indicates, however, that any discriminatory practices which existed in this area came to a complete stop as of July, 1967. At that time new leadership came into control of

Local 38 as a result of an election held in June, 1967. The two principal officials who assumed office were Richard Acton as Business Manager and John Gilbert Steele as President. Mr. Acton replaced all the incumbent business agents, who work in the administration of the referral system, with his own appointees."

### The Apprenticeship Findings

"The Government's attack upon the current selection procedures is not based on an attempt to demonstrate discrimination in actual apprentice selection, as was done for 1965 and 1966, but is rather predicated on the proposition that the procedures are essentially subjective and discretionary, and are inherently discriminatory. It is argued that:

" 'It is of particular importance, then, in light of the EJAC's long history of racial discrimination to ensure that the current selection system is objective and reviewable. For in these circumstances a discretionary system constitutes an unlawful vehicle for further discrimination.'

\*    \*    \*    \*    \*    \*

"In summary, the plaintiff has shown a generally discriminatory approach to apprenticeship by EJAC prior to July 2, 1965. Although the evidence for the years 1965 and 1966 would support a strong suspicion of racial discrimination, the plaintiff has failed to prove an actual pattern and practice of discrimination continuing beyond July 2, 1965. Consequently, the plaintiff is not entitled to a finding in its favor, with a mandatory order directed to EJAC, on this subject matter.

" \*    \*    \* It is the Court's conclusion that their positive actions in moving this union forward in the field of racial integration reflect their own personal convictions and do not represent matters of expediency to develop a record for the courts."

Dealing with the government's charge that Negro applicants were discriminated against in the oral portion of the examination given by defendant EJAC, the District Court held:

"The major evidentiary deficiency in this record is the absence of evidence of the relationship between the oral scores of the Negro applicants in 1965 and 1966 and the oral scores of a significant number of white candidates who performed in a truly comparable manner on the non-oral tests. Although the Court has the total oral and non-oral scores for all applicants in the August, 1965 and August, 1966 classes, the detailed scoring is only available as to the Negro candidates and the successful white candidates, and as between those two groups there is not a sufficient identity of performance on the non-oral side of the tests, when considered in their details rather than as total grade, to make a meaningful comparison. If this record contained evidence that a significant number of whites received substantially higher oral grades than did the Negro applicants despite the fact that the two groups performed in a reasonably comparable fashion on the non-oral tests, that would provide evidence of discrimination. The Court has found no such proof in the record."

### APPELLATE ISSUES

Appellee took no cross-appeal and appellant presents only two issues:

"(1) Whether the district court erred in ruling that, despite their traditional practices of denying membership and referral to Negroes because of their race, defendants may now follow referral and admissions practices which, although racially neutral on their face, perpetuate the effects of past discrimination and result in the present and future denial of employment opportunities to Negroes which are equal to their similarly qualified white contemporaries.

"(2) Whether, having found that defendants engaged in unlawful racially discriminatory employment practices up to the eve of this lawsuit, the district court erred in failing to grant any specific relief, and in refusing to retain jurisdiction and to require the submission of reports and maintenance of records to insure compliance with the law."

We answer both of these questions in the affirmative.

In addition to relying strongly upon the now overruled District Court opinion in the *Sheet Metal Workers* case, *supra*, the District Judge relied heavily upon a provision in the Civil Rights Act of 1964:

"(j) *Preferential treatment not to be granted on account of existing number or percentage imbalance*

"Nothing contained in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area." 42 U.S.C. § 2000e-2(j) (1964).

We believe this section prohibits interpreting the statute to require "preferential treatment" solely because of an imbalance in racial employment existing at the effective date of the Act. But we also believe that its prohibition must be read in conjunction with the fundamental purposes of the statute (see 42 U.S.C. § 2000e-2(c) (1964) above) and in conjunction with the section providing for affirmative relief:

"§ 2000e-6. *Civil actions by the Attorney General.*

"(a) *Complaint.*

"Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) *requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described."* 42 U.S.C. § 2000e-6 (1964). (Emphasis added.)

When the stated purposes of the Act and the broad affirmative relief authorization above are read in context with § 2000e-2(j), we believe that section cannot be construed as a ban on affirmative relief against continuation of effects of past discrimination resulting from present practices (neutral on their face) which have the practical effect of continuing past injustices.

Any other interpretation would allow complete nullification of the stated pur-

poses of the Civil Rights Act of 1964. This could result from adoption of devices such as a limitation of new apprentices to relatives of the all-white membership of a union, Local 53 of Int'l Ass'n of Heat & Frost Insulators & Asbestos Wkrs. v. Vogler, 407 F.2d 1047 (5th Cir. 1969), or limitation of membership to persons who had previous work experience under union contract, while such experience was racially limited to whites, Local 189, United Papermakers & Paperworkers v. United States, 416 F. 2d 980 (5th Cir. 1969), or administration of qualification examinations which had no objective standards and which produced unexplained discriminatory results. United States v. Sheet Metal Workers Int'l Ass'n, Local 36, 416 F.2d 123 (8th Cir. 1969).

While the District Judge did not in theory reject all affirmative relief, he did reject it in this case. In addition he squarely refused to require Local 38 to take appropriate steps to make known to eligible Negroes in the Cleveland area that its recognized pre-Act discriminatory practices in membership, in work referral, and in admittance to apprentice training had ended.

Dealing with a record containing findings of pre-Act discrimination only, the Eighth Circuit said in the *Sheet Metal Workers* case:

"It is equally clear that Local 36 did not permit Negroes to take a journeyman's examination, to join the Local, or to use its hiring hall prior to 1967. The Local built the discriminatory practices into its employment referral system by negotiating a new system of referring persons for employment by priority groups, and by giving preference to those who had an opportunity to gain experience under the collective bargaining agreement and in the industry prior to its effective date.

"In our view, neither Local can be permitted to continue to operate its employment referral systems without change. Both plans effectively operate to deprive qualified Negroes of an equal opportunity for employment as journeymen electricians or as sheet metal workers. Because the plans carry forward the effects of former discriminatory practices, they result in present and future discrimination and are violative of Title VII of the Act.[15]

[15. Local 189, United Papermakers and Paperworkers, AFL–CIO, United Papermakers and Paperworkers, AFL–CIO, CLC; and Crown Zellerbach Corporation v. United States of America, 416 F.2d 980 (5th Cir. 1969), aff'g, United States by Clark v. Local 189, United Papermakers and Paperworkers, 282 F.Supp. 39 (D.C.La.1968); Local 53 of Int. Ass'n of Heat & Frost I. & A. Wkrs. v. Vogler, 407 F.2d 1047 (5th Cir. 1969), aff'g Vogler v. McCarty, Inc., 294 F.Supp. 368 (E.D.La.1968); N.L.R.B. v. Local 269, Internat'l Bro. of Elec Wkrs., 357 F.2d 51 (3rd Cir. 1966); Dobbins v. Local 212 International Bro. of Elec. Wkrs., 292 F.Supp. 413 (S.D.Ohio 1968); Quarles v. Philip Morris Incorporated, 279 F.Supp. 505 (E.D.Va.1968). Contra, Griggs v. Duke Power Company, 292 F.Supp. 243 (M.D.N.C.1968); U. S. v. International Brotherhood of Electrical Workers, Local 39, 71 L.R.R.M. 2087 (1969); U. S. v. International Brotherhood of Electrical Workers, Local 38, 70 L.R. R.M. 3019 (1969). The Dobbins Court, 292 F.Supp. at 445, said:

" 'A policy of giving priority in work referral to persons who have experience under the Local's Collective Bargaining Agreement is discriminatory when competent [Negroes] have previously been denied the opportunity to work under the referral agreement by reason of their race * * *.' "]

"We recognize that each of the cases cited in n. 15 to support our position can be distinguished on the ground that in each case, a number of known members of a minority group had been discriminated against after the passage of the Civil Rights Act. Here, we do not have such evidence, but we do not believe that it is necessary. The record does show that qualified Negro tradesmen have been and continue to be residents of the area. It further shows that they were acutely aware of the Locals' policies toward minority groups. It is also clear that they knew

that even if they were permitted to use the referral system and become members of the union, they would have to work for at least a year before they could move into a priority group which would assure them reasonably full employment. In the light of this knowledge, it is unreasonable to expect that any Negro tradesman working for a Negro contractor or a nonconstruction white employer would seek to use the referral systems or to join either Local."

United States v. Sheet Metal Workers Int'l Ass'n, Local 36, 416 F.2d 123, 131–132 (8th Cir. 1969).

It is important, however, to note that the record of this case shows two years of discriminatory practices *after* the effective date of the Act.

As of the date of the complaint in this case, defendant union had 1,318 members, of whom two were Negroes. On that date it had 255 apprentices, of whom three were Negroes. And in the preceding year it had referred 3,487 persons for work in the electrical trades through its hiring hall, of whom only two were Negroes.

The District Judge found that the evidence supported the government's claims of discriminatory practices extending up to and beyond the date of the filing of this complaint.

While he limited specific findings of discrimination to the union's referral practices, these practices controlled absolutely who got jobs in the organized electrical trades in the Cleveland area. The record discloses that 75% of all electrical construction work in the Cleveland area was done under Local 38's contract.

■ These facts (and the above-stated difference of interpretation of 2000e–2(j)) require vacation of the pro forma judgment entered by the District Judge and remand for consideration of appropriate affirmative relief. We feel that this view represents the great weight of authority among the federal courts which have as yet dealt with this type of problem. United States v. Sheet Metal Workers Int'l Ass'n, Local 36, 416 F.2d 123 (8th Cir. 1969); Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969); United States v. Hayes Int'l Corp., 415 F.2d 1038 (5th Cir. 1969); Local 53 of Int'l Ass'n of Heat & Frost Insulators & Asbestos Wkrs. v. Vogler, 407 F.2d 1047 (5th Cir. 1969), Dobbins v. Local 212, IBEW, 292 F.Supp. 413 (S.D.Ohio 1968); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va. 1968). *See also* Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir. 1970).

We do not, however, wish to ignore the other factor which played an important—perhaps decisive—role in the District Judge's decision concerning affirmative relief in this case.

■ As we have indicated, after this suit was filed by the Attorney General, but before trial, a new administration was elected to office in Local 38. The District Judge found that the new officers favor voluntary compliance with the Civil Rights Act of 1964 and have taken steps to bring past discriminatory practices to an end. These facts, however, do not in our opinion warrant the District Court's refusal to retain jurisdiction of this case or its refusal of affirmative relief. The record of compliance is very brief—particularly as compared to the long record of discrimination—and even that record has been written under the impact of this litigation. Cypress v. Newport News Gen'l & Nonsectarian Hosp. Ass'n, 375 F.2d 648 (4th Cir. 1967). Assuming, as the District Judge plainly did, and as we do, that the new leadership is in utter good faith, it has no mean task ahead in eliminating ingrained discriminatory practices of past decades. In many respects a more specific court order, plus retention of jurisdiction, might serve to support the stated objectives of the new administration of Local 38. And, in any event, such relief is authorized by the Act and called for in this record. United States v. Hayes Int'l Corp., 415 F.2d 1038 (5th Cir. 1969).

We do not at this point seek to write the order or even to specify an outline for it. The District Court may find appropriate the forms of relief granted in the Sheet Metal Workers case, supra, and in the Local 189 case, supra. See also Dobbins v. Local 212, IBEW, 292 F. Supp. 413 (S.D. Ohio 1968). Or if the District Judge's hopes (and ours) prove well-founded, it may be possible for these previously adversary parties to agree upon and stipulate to the measures needed to achieve defendants' full compliance with the Civil Rights Act of 1964.

The judgment of the District Court is vacated and this case is reversed and remanded for further proceedings consistent with this opinion.